Patrick J. Kane (SBN 273103)
**MAURICE WUTSCHER LLP**
440 Stevens Avenue, Suite 200
Solana Beach, California 92075
Tel. (858) 381-7860
Facsimile: (866) 581-9302
E-mail: pkane@mauricewutscher.com

*Attorneys for Plaintiff,*
*Produce Pay, Inc.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| PRODUCE PAY, INC., | Case No.: 2:22-cv-4167 |
| Plaintiff, | **PRODUCE PAY'S COMPLAINT** |
| v. | **FOR DAMAGES AND** |
| STAR PRODUCE US LP; STAR PRODUCE LTD.; THEODORE MATTHEW JOHN BATES A/K/A MATT BATES; and ERNESTO MALDONADO A/K/A ERNESTO MALDONADO GARZA, each individually, | **DECLARATORY RELIEF** |
| Defendants. | |

Plaintiff, Produce Pay, Inc. ("Produce Pay") hereby files this Complaint against Defendants, Star Produce US LP ("Star US"), Star Produce Ltd. ("Star Global"), Theodore Matthew John Bates a/k/a Matt Bates ("Bates"), and Ernesto Maldonado a/k/a/ Ernesto Maldonado Garza ("Maldonado") (collectively, "Defendants") and alleges the following:

## **THE PARTIES**

1.      Produce Pay a Delaware corporation with its principal place of business located at 888 W. 6th Street, Suite 200, Los Angeles, California 90017.

2.      Produce Pay has developed and maintains an innovative, on-line trading platform (the "Platform") that allows Produce Pay to work directly with

growers, sellers, and buyers of perishable agricultural commodities ("Produce") at shipping point, providing record keeping, marketing, accounting, and other services appurtenant to its Produce dealings. The Platform and the contracts that Produce Pay establishes with its customers and trading partners are carefully designed to facilitate and incentivize trading in Produce in a manner that is more efficient, stable, and profitable for participants in the nationwide Produce distribution chain.

3.    Produce Pay is engaged in the business of, *inter alia*, buying and selling Produce subject to the provisions of Perishable Agricultural Commodities Act, 1930, *as amended*, 7 U.S.C. §§ 499a-499t (2016) ("PACA").  Produce Pay is the holder of PACA license number 20150951, which the United States Department of Agriculture ("USDA") issued to Produce Pay on or about August 5, 2015 and was active throughout Produce Pay's dealings with the Defendants.

4.    Defendant Star US is a limited partnership formed and registered in the State of Delaware and registered as a foreign limited partnership with the California Secretary of State as file number 200119100005.  Star US has a principal place of business located at 3380 Woods Edge Circle, Suite 102, Bonita Springs, Florida 34134.  At all times relevant hereto Star US operated, conducted, and otherwise was engaged in or carried on the business of buying and selling Produce in interstate or foreign commerce, and upon information and belief[1], knowingly received Produce owned by and/or subject to the lien of Produce Pay in multiple shipments wherein many individual shipments exceeded 2,000 pounds and, therefore, constituted wholesale quantities of Produce.

[1] On or upon "information and belief," as used herein, means Produce Pay is informed and believes a fact or condition to be true and, upon such information and belief, alleges the fact or condition in connection with the instant complaint.  Produce Pay's information and beliefs are based upon investigation and derived from such sources as: Produce Pay's conversations with Defendants, e-mail correspondence with Defendants, publicly available government documents, relevant statements or information contained on Defendant owned or controlled websites, import/export documents, Produce Pay's communications with Defendants, Produce Pay and Defendants relevant produce transaction documents, documents Defendants uploaded to and otherwise provided Produce Pay, and relevant third party documents.

5.     Defendant Star Global is a Canadian limited partnership with a principal place of business located 2941 Portage Avenue, Saskatoon, SK Canada S7J 3S6.   At all times relevant hereto Star Global operated, conducted, and otherwise was engaged in or carried on the business of buying and selling Produce in interstate or foreign commerce, and upon information and belief[2], knowingly received Produce owned by and/or subject to the lien of Produce Pay in multiple shipments wherein many individual shipments exceeded 2,000 pounds and, therefore, constituted wholesale quantities of Produce.

6.     Star Global markets its services in California, enters into contracts with California companies, including with Plaintiff, and has issued press releases identifying itself as a contracting party in contracts with California entities.

7.     Defendants Star US and Star Global operate and market their service jointly as "The Star Group" and share a website at https://www.starproduce.com/.

8.     Defendant Bates is a resident of British Columbia, Canada who serves as an employee, officer, or director of Star Global, and was in a position to exercise dominion and control over Star Global at all times relevant to this action and otherwise participated in the tortious conduct or other wrongs set forth herein.  The Star Group has represented Bates on the internet as the Vice President of Operations of Star Global and the President of a related company called "Star Produce MX." Bates signed documents on behalf of Star US listing himself as a President of Star US, a Senior Vice President of Star US, but also signed documents on behalf of Star Global identifying himself as a Senior Vice President of Star Global.  Bates is listed

---

[2] On or upon "information and belief," as used herein, means Produce Pay is informed and believes a fact or condition to be true and, upon such information and belief, alleges the fact or condition in connection with the instant complaint.  Produce Pay's information and beliefs are based upon investigation and derived from such sources as: Produce Pay's conversations with Defendants, e-mail correspondence with Defendants, publicly available government documents, relevant statements or information contained on Defendant owned or controlled websites, import/export documents, Produce Pay's communications with Defendants, Produce Pay and Defendants relevant produce transaction documents, documents Defendants uploaded to and otherwise provided Produce Pay, and relevant third party documents.

as the "Senior Vice President" of Star Global in the Produce Blue Book on Blue Book Services, Inc. (the "Blue Book"), which is a prominent listing service for the produce industry. Bates has done significant business in and made multiple trips to California, in continuous and systematic fashion.

9.      Defendant Maldonado is a resident of Tucson, Arizona who serves as an employee, officer, or director of Star US, and was in a position to exercise dominion and control over Star US at all times relevant to this action and otherwise participated in the tortious conduct or other wrongs set forth herein. Maldonado identifies himself on his LinkedIn page as "Director/Grower Relations" of The Star Group, but also identifies himself as "General Manager" of Star US in the Blue Blook, and in his email correspondence with Plaintiff. Maldonado has done significant business in and made multiple trips to California, in continuous and systematic fashion, and upon information and belief has previously been a resident of the State of California.

## JURISDICTION AND VENUE

10.      The District Court has subject matter jurisdiction over this civil action arising under 7 U.S.C. § 499e(b)(4) ("liability may be enforced by … suit in any court of competent jurisdiction….") and pursuant to 28 U.S.C. § 1331 because this matter involves the interpretation of a federal statute.

11.      The District Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1337 because PACA qualifies as an "Act of Congress regulating commerce" and several of Produce Pay's claims herein arise under 7 U.S.C. § 499b(4).

12.      The Court has supplemental jurisdiction over Produce Pay's other claims pursuant to 28 U.S.C. § 1367(a).

13.      The Court has *in rem* jurisdiction over Produce Pay's claims pursuant to, *inter alia*, 28 U.S.C. § 1655.

14.      Venue is appropriate in this judicial district because Plaintiff resides in

this district, a substantial part of the acts and omissions giving rise to Plaintiff's claim occurred in this judicial district, and Defendants are subject to personal jurisdiction in this judicial district.

## NATURE OF THE CASE

15.    This is a civil action for monetary, pursuant to which Produce Pay seeks to enforce its rights against the Defendants under PACA's Unfair Conduct provisions and further seeks relief under state law for breach of contract, breach of guaranty, conspiracy to defraud, breach of the covenant of good faith and fair dealing, alter ego liability, and aiding and abetting a breach of fiduciary duty.

16.    As set forth in detail herein, Produce Pay obtained title to blueberries and blackberries (the "Berries") that Produce Pay acquired from a Mexican company named Grupo Heres S. De. R.L. De C.V. ("Grupo Heres").    The transactions between Produce Pay and Grupo Heres were governed by a prepayment agreement for each harvest season. Under the typical prepayment agreement, Produce Pay would provide substantial sums to fund a grower's harvest needs, would assume title to the Produce, and would have the ability exercise oversight or control over the sales of the Produce.    A grower would typically be obligated to reimburse Produce Pay for the monies wired to the grower during the harvest, which Produce Pay typically collects from the downstream commercial buyers of the produce shipments.    The prepayment agreement relevant to this lawsuit involved the 2021-22 Season.

17.    Star US is in the business of buying and selling bulk quantities of perishable produce.    Star US had a Distribution Agreement with Produce Pay dated December 24, 2019 (the "Distribution Agreement"), pursuant to which Plaintiff would sell and/or consign Produce to Star US.    The Distribution Agreement was applicable to various produce deals and harvests which Star US participated in with Produce Pay.    One of those produce deals arose from a prior prepayment agreement Produce Pay had with Grupo Heres for berries for the 2020-21 Season.    At the end

of the 2020-21 Season, Star US was satisfied with its economic return from the deal, but Produce Pay made clear that Produce Pay was not satisfied with the performance of Grupo Heres.

18.    When Grupo Heres sought to enter into a prepayment agreement for the 2021-22 Season, Produce Pay declined, citing concerns about risk and the prior performance of Grupo Heres.  But Star US, and its close Canadian affiliate, Star Global (who market and present themselves collectively as "The Star Group" and are referred to herein as the "Star Group Defendants") induced Produce Pay to enter into the second prepayment agreement with Grupo Heres (the "Grupo Heres 2021-22 Prepayment Agreement") by signing multiple guarantees, culminating in a $600,000.00 guaranty (the "$600K Guaranty" or "Addendum 2") of the Producer's performance as an expressed addendum to the Distribution Agreement.  In the $600K Guaranty, both Star US and Star Global were identified as "Distributors" for the purposes of the Distribution Agreement, and each committed itself to guaranty the obligations of Grupo Heres up to $600,000.00 USD.  <u>Produce Pay would not have wired funds to Grupo Heres for the 2021-22 Season without receiving a total guaranty of $600,000.00.</u>  Grupo Heres ultimately failed to meet certain performance milestones and ceased its operations before the end of the 2021-22 Season.  The default by Grupo Heres was caused in part by Star US arbitrarily canceling produce purchases upon late notice, and Star US failing to acquire the Produce in the quantities it represented it would acquire prior to the 2021-22 Season.  The actions by the Star Group Defendants disrupted the finances of Grupo Heres, and impacted the sales prices obtained when the Produce had to be shipped on consignment to an alternative produce distributor.  This scenario was precisely why Produce Pay required a guaranty from the Star Group Defendants.

19.    Produce Pay has demanded that the Star Group Defendants abide by the $600K Guaranty and reimburse Produce Pay for the balance owed to Produce Pay by Grupo Heres.  The Defendants have refused to honor their obligation.  The

Defendants have strangely and desperately argued that Bates and Maldonado lack authority to bind either of the Star Group Defendants to contracts, despite having Bates and Maldonado execute multiple agreements with no prior revocation or denial of signature authority.  To the extent that Bates and Maldonado are deemed to lack authority to enter in the agreements and amendments, then the Defendants have jointly conspired to deceive and defraud Produce Pay to induce Produce Pay into costly financial commitments, and the Defendants collectively should not benefit from utilizing a shell game in which they will only honor Produce deals that end favorably, while they run from obligations from those harvests that fail.

20.    Defendants failed to pay Produce Pay for Produce and/or guarantees in the current amount of not less than $475,000.00, plus further interest at the prejudgment statutory rate, and costs of collection, including attorneys' fees, as sums owing in connection with Defendants' failure to pay or reimburse Produce Pay for the Produce transactions and related contractual and statutory obligations.

## FACTUAL ALLEGATIONS

### Produce Pay's Pattern of Selling Produce to Star US

21.    On or about December 24, 2019, Produce Pay and Star US entered into a written distribution agreement wherein Star Produce would have access to the Platform, and Star US would acquire perishable produce from Produce Pay.  A true and correct copy of the Distribution Agreement is attached hereto as **Exhibit A**.

22.    The Distribution Agreement defines Produce Pay as the "Company" and defines a "Producer" as "any party from which Company acquires Produce" for the purposes of the Distribution Agreement.  *See,* Ex. A at § 2.1, p. 5.

23.    Pursuant to the Distribution Agreement, Star US would receive and accept certain perishable produce owned by Produce Pay and delivered to Star US by a Producer, and the individual shipments of the Produce are described in the Distribution Agreement as a "Distributed Asset Pool."

24.    Pursuant to the Distribution Agreements, Star US utilized Produce

Pay's Platform to identify all the Produce owned by Produce Pay that Star US received and accepted from a delivery by a Producer on Produce Pay's behalf.

25.    Star US received and accepted Produce owned by Produce Pay that was delivered by Producers.

26.    Star US purchased Produce from Produce Pay pursuant to the Distribution Agreement.

27.    Star US was consigned Produce from Produce Pay pursuant to the Distribution Agreement.

28.    Produce Pay utilized, *inter alia*, Produce identification information provided by a Producer and Star US to prepare and issue invoices to Star US for the Produce owned by Produce Pay and delivered to Star US by a Producer on Produce Pay's behalf.

29.    When Star US acted as Produce Pay's consignment agent, Star US was responsible for selling Produce Pay's Produce to third parties and remitting the invoice price of the Produce to Produce Pay.

30.    When Star US acquired Produce on a fixed price basis, Star US was required to pay Produce Pay for the Produce.

31.    Star US made payments to Produce Pay for Berries Star US received during the 2021-22 Season.

**The Original Guaranty Clause of the Distribution Agreement**

32.    The Distribution Agreement defines a "Prepayment Agreement" as "an agreement between Company and a Producer relating to the prepayment for a Distributed Asset Pool by the Company." *See,* Ex. A at § 2.

33.    Produce Pay is the "Company" for the purposes of the Distribution Agreement.

34.    Star US is the original Distributor for the purposes of the Distribution Agreement.  Any additional party defined as a "Distributor" in an amendment to the Distribution Agreement is also subject to any and all obligations of a Distributor

as defined in the Distribution Agreement.

35.     The Grupo Heres Prepayment Agreement as defined below constitutes a "Prepayment Agreement" for the purposes of the Distribution Agreement.

36.     Under Section 13.1 of the Distribution Agreement, "The Distributor absolutely, unconditionally and irrevocably guarantees to Company the due and punctual payment, performance and discharge of" a guaranteed portion of the "Preseason Prepayment Obligations." The Guaranteed Portion varied upon written terms agreed to by Produce Pay and the Distributor as it related to a particular Producer or season. But Section 13.1 further provided that "in the event of fraud by the Distributor in any matters related to the Prepayment Agreement, this Agreement or the Distributed Asset Pools, the Guaranteed Portion shall be 100%." Section 13.1 of the Distribution Agreement is hereafter referred to herein as the "Original Guaranty."

**Attorneys' Fees and Interest Provisions in the Distribution Agreement**

37.     Produce Pay utilized its invoices to Star US to reiterate its contractual right to recover interest and attorneys' fees and costs in and to each load of Produce listed therein.

38.     As stated on the face of each of Produce Pay's invoices, Produce Pay and Star US agreed that "interest shall accrue on any past-due account balance at the rate of 1.5% per month (18% per annum), or at the maximum allowable rate under applicable law, until such time as full payment is received" and that "[i]n the event any collection action or other legal proceeding becomes necessary to enforce any right under this agreement, Buyer agrees to pay all costs of collection or enforcement, including reasonable attorneys' fees."

39.     Defendants did not object to Produce Pay's inclusion of the contract language quoted in paragraph 38 above as a material part of the parties' agreement.

40.     The contract language quoted in paragraph 38 above represents a material part of Produce Pay's standard contract terms.

41.    Produce Pay's inclusion of the contract language quoted in paragraph 38 above represents a standard industry practice and, as such, is of no surprise to Defendants.

42.    Star US further agreed under the Distribution Agreement that "in any action arising out of or relating to this Agreement, the non-prevailing party will pay the substantially prevailing party's reasonable attorneys' fees, costs, and necessary disbursements, whether or not the action is prosecuted to award or judgment." *See,* Ex. A at § 10.10.

### The First Addendum Amends the Distribution Agreement to Add Star Global as a Distributor Jointly with Star US.

43.    Star US agreed that the Distribution Agreement "sets forth the sole understanding and agreement of the Parties...with respect to the subject matter [thereof] and supersedes all other prior and contemporaneous discussions, negotiations [*sic*] agreements and understandings, whether written or oral, between them. *See,* Ex. A at § 10.6.

44.    Star US agreed that "[n]o modification of this Agreement...shall be valid or effective unless it is (a) in writing and duly executed by the parties hereto, or (b) electronically accepted by Distributor on the Platform." *See,* Ex. A at § 10.7.

45.    The Parties amended the Distribution Agreement by way of an Addendum dated November 5, 2020 (the "First Addendum"), which was executed by Produce Pay, Star US, and Star Global.  A true and correct copy of the First Addendum is attached hereto as **Exhibit B**.

46.    The First Addendum defined a "Producer" as "any party...from which the Company acquires Produce that is sold by Distributor under this Agreement." *See,* Ex. B at § 1, p. 2.

47.    The First Addendum explicitly included Star Global in the definition of "Distributor." *See,* Ex. B at p. 1.

48.    As a result of the First Addendum, any obligation in the Distribution

Agreement is owed jointly and severally by each of the Star Group Defendants.

49.    The Distribution Agreement provided that the "Term" of the Distribution Agreement would automatically renew for one-year terms on each anniversary of the Effective Date, unless one of the Parties provided written notice of a decision to terminate the Distribution Agreement. *See,* Ex. A at § 2.1, p. 5.

50.    No written notice was provided to end the Term by Produce Pay or any Defendant.

## **Defendants Use New Guarantees to Induce Produce Pay**
## **to Purchase Produce from Grupo Heres in the 2021-22 Season.**

51.    On or about July 10, 2020, Produce Pay entered into written agreements, including a Pre-Season Prepayment Agreement, with Grupo Heres wherein Produce Pay agreed to purchase, and Grupo Heres agreed to sell, certain Produce (specifically, blackberries and blueberries) to Produce Pay for the 2020-21 season.

52.    Grupo Heres was a Producer for the purposes of the Distribution Agreement.

53.    Star US agreed to act as the Distributor of the Produce which Produce Pay acquired from Grupo Heres for the 2020-21 season.

54.    Produce Pay's consignment to Star US of the Produce which Produce Pay acquired in the 2020-21 season from Grupo Heres was governed by the Distribution Agreement.

55.    In 2021, Grupo Heres requested that Produce Pay enter into another prepayment agreement to advance funds for berries to be harvested for the 2021-22 season.

56.    In 2021, the Star Defendants contacted Produce Pay to express support for Produce Pay entering into a contract with Grupo Heres for the 2021-22 season and requesting an opportunity to distribute the Berries that Produce Pay would acquire from Grupo Heres for the 2021-22 season.

57. Produce Pay informed Defendants that Produce Pay would not enter into a contract with Grupo Heres for the 2021-22 season without receiving $600,000.00 in guaranties from the distributors of the Produce.

58. In August 2021, the Star Group Defendants initially executed a guaranty of the Grupo Heres 2021-22 obligations to Produce Pay in the amount of $400,000.00 (the "Initial $400K Guaranty"). Bates signed the Initial $400K Guaranty as "President" of Star US and as "President" of Star Global on August 5, 2021. A true and correct copy of the Initial $400K Guaranty is attached as **Exhibit C**.

59. The Star Defendants also committed to purchase 300,000 cases of Berries originated by Grupo Heres for the 2021-22 Season.

60. In August 2021, Grupo Heres represented that another distribution company was going to provide an additional $200,000.00 guaranty to provide the total coverage of $600,000.00 sought by Produce Pay. Ultimately, the additional $200,000.00 guaranty was not obtained from another company.

61. The Initial $400K Guaranty was executed by Bates on behalf of the Star Group Defendants before Produce Pay and Grupo Heres executed the Prepayment Agreement for the 2021-22 Season.

62. After the Initial $400K Guaranty was signed by Bates, Produce Pay entered into a written Prepayment Agreement with Grupo Heres for the 2021-22 season (the "Grupo Heres 2021-22 Prepayment Agreement") wherein Produce Pay agreed to purchase, and Grupo Heres agreed to sell, certain Produce (specifically, blackberries and blueberries) to Produce Pay.

63. Produce Pay wired funds to Grupo Heres in reliance on the Initial $400K Guaranty.

64. When the additional $200,000.00 in guarantees was not obtained from another party, a document entitled "Addendum 2" was signed by Bates on behalf of Star Global and by Maldonado on behalf of Star Global, which confirmed and

constituted the $600K Guaranty.   A true and correct copy of Addendum 2 is attached hereto as **Exhibit D**.

65.    Addendum 2 defines Star US and Star Global as "Distributors" and states that both Distributors "are parties to a Distribution Agreement" which is the Distribution Agreement attached as Exhibit A to this Complaint. *See* Ex. D at p. 1.

66.    Addendum 2 states: "Distributor absolutely, unconditionally and irrevocably guarantees to Company the due and punctual payment, performance and discharge of all liabilities of the Producer to Company under the Prepayment Agreement dated August 9, 2021, between the Company and Grupo Heres S. de R.L. de C.V., up to $600,000.00." *See,* Ex. D at § 8.1, p. 1.

67.    Addendum 2 further states: "This guaranty is a guaranty of prompt and punctual payment of the Prepayment Obligations and is not merely a guaranty of collection.   These obligations are independent of Producer's obligations and separate actions may be brought against Distributor."

68.    Produce Pay informed Defendants that Produce Pay would not enter into a written agreement with Grupo Heres for the 2021-22 season without a commitment by Star US and Star Global to the guaranty provisions stated in Addendum 2.

69.    Star US was aware on September 7, 2021 that Maldonado signed Addendum 2.

70.    Star Global was aware on September 7, 2021 that Bates signed Addendum 2.

71.    On September 8, 2021, Produce Pay wired an additional tranche of funding under the Grupo Heres 2021-22 Prepayment Agreement to Grupo Heres as a response to obtaining Addendum 2 from the Star Group Defendants.

72.    Bates told Produce Pay that he had authority to sign Addendum 2 on behalf of Star Global.   Bates also has signed multiple documents on behalf of Star US.

73.    Bates never told Produce Pay in 2021 that he did not have authority to sign Addendum 2 on behalf of Star Global.

74.    Star Global did not state any intention to Produce Pay to revoke or renounce Addendum 2 in 2021.

75.    Star Global has accepted and ratified multiple contractual documents executed by Bates in the name of Star Global.

76.    Star Global has accepted and ratified multiple contractual documents executed by Bates in the name of Star US.

77.    Maldonado told Produce Pay that he had authority to sign Addendum 2 on behalf of Star US.

78.    Maldonado never told Produce Pay in 2021 that he lacked authority to sign Addendum 2 on behalf of Star US.  Maldonado has also signed at least one other document on behalf of Star Global.

79.    Star US did not state any intention to Produce Pay to revoke or renounce Addendum 2 in 2021.

80.    Star US has accepted and ratified multiple contractual documents executed by Maldonado on behalf of Star US.

81.    It was reasonable for Produce Pay to believe that Bates had authority to sign Addendum 2 on behalf of Star Global.

82.    It was reasonable for Produce Pay to believe that Maldonado had authority to sign Addendum 2 on behalf of Star US.

83.    Pursuant to its prepayment relationship with Produce Pay, Grupo Heres sold, conveyed, voluntarily transferred, and assigned all or the entirety of its right, title, and interest in and to the Berries to Produce Pay.

84.    Grupo Heres utilized Produce Pay's Platform at shipping point to, *inter alia*, identify all of the Produce it transferred title over to Produce Pay for the 2021-22 Season, and to connect with Produce Pay's designated distributor responsible for importing and receiving the Produce that Grupo Heres sold to Produce Pay.

85.   Star US imported, received, and accepted all the Produce owned by Produce Pay from the shipment by Grupo Heres at its facilities within the State of Texas.

86.   Star US communicated acceptance of the shipments on the Platform.

87.   Produce Pay wired a total of $595,000.00 USD between August 11, 2021 and September 8, 2021 to Grupo Heres in 2021 under the Prepayment Agreement, which Grupo Heres used to fund the harvest for the 2021-22 season. The $595,000.00 figure was calculated based on the $600,000.00 scheduled payments set forth in the Grupo Heres 2021-22 Prepayment Agreement, minus the application fee of $5,000.00 provided for in the prepayment agreement.  The wires were sent based upon the guaranty commitments made by the Star Group Defendants in the Initial $400K Guaranty, and in the ultimate $600K Guaranty provided by the Star Group Defendants.

88.   Grupo Heres began exporting the Berries in October 2021.

89.   Grupo Heres would sometimes source Produce from growers in Mexico in order to fill shipping requests received from Produce Pay and Star US.

90.   Star US would request Produce shipments in certain volumes via purchase orders or electronic communications it shared with Grupo Heres and Produce Pay.

91.   Star US canceled some shipments of the Berries after arrangements had been made to source and ship the Produce to Star US.

92.   Star US declined some shipments of the Berries without seeing the Berries or having the Berries inspected for quality.

93.   Star US would cancel orders for the Berries with the excuse that there was no current market for the Produce in the quantities Star US had previously requested.

94.   The actions of Star US in arbitrarily canceling Produce orders that had already been prepared forced Produce Pay and Grupo Heres to have to find

alternative buyers or consignment agents for the Produce on short notice.  As a result, Grupo Heres fell behind in its obligations to Produce Pay and breached its obligations to Produce Pay under the

95.    Maldonado confirmed in email correspondence that Star US had committed to buy 300,000 cases of Berries originated by Grupo Heres in the 2021-22 Season.  Maldonado further confirmed in email correspondence that Star US was obligated to honor the $600K Guaranty.

96.    The Star Group Defendants did not purchase 3000,000 cases of Berries originated by Grupo Heres in the 2021-22 Season.

97.    Produce Pay performed all of its contractual obligations under the Grupo Heres 2021-22 Prepayment Agreement.

98.    Produce Pay performed all of its contractual obligations under the Distribution Agreement.

**Defaults by Producer, and Denials and Deflections by the Defendants**

99.    Grupo Heres defaulted on its payment and performance obligations to Produce Pay under the Prepayment Agreement for the 2021-22 Season.

100.    On February 10, 2022, Produce Pay's Senior Vice President, Benjamin M. Kahrl, sent an email to Defendants addressed to the email accounts of Bates and Maldonado, demanding payment of the $600K Guaranty.

101.    On February 10, 2022, Bates called Kahrl's cell phone (the "February 10 Call" and argued that Produce Pay was responsible for the poor performance of Grupo Heres, and that Produce Pay was at fault for originally introducing Grupo Heres to Star US.  Bates did not comment at all during the February 10 Call on the legitimacy or authenticity of Addendum 2.

102.    Bates did not deny that he and Maldonado signed Addendum 2 during the February 10 Call.

103.    On the February 10 Call, Bates did not state that he lacked authority to sign on behalf of Star Global.

104.   On the February 10 Call, Bates did not state that Maldonado lacked authority to sign on behalf Star US.

105.   On April 29, 2022, Kahrl sent another email to Defendants to the email accounts of Bates and Maldonado demanding payment of the 2021-22 Guaranty. Bates called Kahrl that same day (the "April 29 Call"), raising the same issues he raised on February 10, 2022.  During the April 29 Call, Bates: (a) did not comment at all on the legitimacy or authenticity of Addendum 2; (b) did not state any denial that he and Maldonado signed Addendum 2; (c) did not state that he lacked authority to sign on behalf of Star Global; and (d) did not state that Maldonado lacked authority to sign on behalf of Star US.

106.   On April 29, 2022, Bates also sent an email addressed to Kahrl and Produce Pay's CEO Pablo Borquez Schwarzbeck (the "April 29 Reply") stating:

Ben/Pablo:

Can you please stop harassing members of the Star Group regarding this issue.

I spoke to Ben back in February and indicated that Grupo Heres did not have nor the quality, the quantity, the ability to ship or the varieties indicated at the beginning of the season.  Further to this, I just called Ben to indicate the same information.

The deal was grossly misrepresented both by both Produce Pay and Grupo Heres.  Any funds provided to Grupo Heres were done by the free will and vetting of Produce Pay and are not the responsibility of The Star Group.

Matt Bates
The Star Group

107.   The April 29 Reply, which Bates signed on behalf of "The Star Group," did not contain any reference to Addendum 2.  A true and correct copy of the April 29, 2022 email reply from Bates to Kahrl, including the email string of prior email correspondence exchanged on February 10 and April 29, is attached to the Complaint as **Exhibit E**.

108.   Defendants have not paid the full amount owed to Produce Pay under the $600K Guaranty in Addendum 2.

### **Produce Pay's Lien Against Star US**

109.    Star US granted Produce Pay security interest in the assets of Star US, and authorized Produce Pay to file a corresponding financing statement against the assets of Star US in Section 13 of the Distribution Agreement.

110.    Star US and Star Global further granted Produce Pay a security interest in the assets of Star US and Star Global (respectively) and authorized the filing of corresponding financial statements against the assets of the Star Group Defendants, in Section 7 of the First Addendum.

111.    Star US and Star Global further granted Produce Pay a security interest in the assets of Star US and Star Global (respectively) and authorized the filing of corresponding financial statements against the assets of Star US and Star Global, in Section 8 of Addendum 2.

112.    In order to secure obligations guaranteed by Star US, Produce Pay recorded a UCC Financing Statement through Produce Pay's recording agent, Corporation Service Company ("CSC").  A true and correct copy of the UCC Financing Statement, recorded as Document # 202201994178 (the "UCC Financing Statement") by the State of Florida Secretary of State in the Florida Secured Transaction Registry District of Columbia Recorder of Deeds, is attached hereto as **Exhibit F**.

113.    Produce Pay is the owner and holder of the interest secured by the UCC Financing Statement.

114.    The filing of the UCC Financing Statement was expressly provided for in the Distribution Agreement, and more specifically in Addendum 2, and consented to by Star US.  Star US and Produce Pay expressly agreed that Produce Pay would have a perfected, first priority lien interest in the Produce and any assets of Producer necessary to secure the funds advanced for the Produce.

115.    The UCC Financing Statement defines the collateral interest (the "Lien") as including all of Star US's accounts, contract rights and any claims owned

by Star US relating to those accounts and contract rights, as well as claims on Star US's goods, equipment, vehicles, personal property, inventory, intellectual property, instruments, and other forms of assets.

116.    The Lien has been perfected and is enforceable against the assets of Star US.

**COUNT I**
**PACA Violation (Unfair Trade Practice)**
**Breach of Express or Implied Duty ,7 U.S.C. §499b(4)**
**(As to Star US Only)**

117.    Produce Pay re-alleges paragraphs 1 through 116 as though fully set forth herein.

118.    Star US is the holder of PACA license number 20011307, which the USDA issued to Star US on or about June 29, 2001 and was active throughout Star US's dealings with Grupo Heres and Produce Pay.

119.    In conjunction with its produce transactions with Plaintiff, Star US acted as a "commission merchant," "dealer," or "broker" of produce as defined in PACA.

120.    Under 7 U.S.C. §499b(4), it is unlawful for a PACA licensee, commission merchant, dealer, or broker "to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with" any produce transaction covered by PACA.

121.    As a PACA licensee and dealer of Produce, Star US possessed a statutory duty under 7 U.S.C. §499b(4) to perform all expressed or implied undertakings required under the Produce transactions.

122.    The actions of Star U.S. in arbitrarily canceling its orders of the Produce and to purchase the Produce in the agreed-to volume constituted a failure to perform its express or implied duties to Produce Pay.

123.    The actions of Star U.S. in arbitrarily canceling Produce orders and failing to order in agreed-to volumes were without reasonable cause.

124.    Star U.S. knew that Produce Pay would not enter into the Prepayment

Agreement with Grupo Heres without the guaranty by the Star Group Defendants.

125. The guaranty was an expressed duty arising out of an undertaking in connection with a Produce transaction covered by 7 U.S.C. §499b(4).

126. The failure of Star US to pay the guaranty to Produce Pay constitutes a failure to perform an expressed duty arising out of an undertaking in connection with a Produce transaction covered by PACA.

127. The failure of Star US to honor the guaranty was without reasonable cause.

128. The failure of Star US to fulfill the aforementioned expressed duties constituted violations of 7 U.S.C. §499b(4).

129. As a direct result of Company's failure to pay Produce Pay, Produce Pay has incurred damages in an amount not less than $475,000.00 USD, plus further interest, and all costs of collection, including attorneys' fees.

WHEREFORE, Produce Pay respectfully seeks the entry of an Order providing as follows:

1. Entering a Final Judgment in favor of Produce Pay and against Star US, in an amount not less than $475,000.00, plus prejudgment interest and costs of collection, including attorneys' fees, incurred in this action; and

2. Providing such other and further relief as the Court deems appropriate upon consideration of this matter, including a declaration that Produce Pay may enforce its Lien against Star US's debtors and assets, and against the debtors and assets of its alter ego, Star Global.

## COUNT II
### Breach of Contract Concerning $600K Guaranty in Addendum 2
#### (As to the Star Group Defendants Only)

130. Produce Pay re-alleges paragraphs 1 through 129 as though fully set forth herein.

131. As a condition of the Distribution Agreement as amended by Addendum 2, Star US and Star Global agreed to be jointly and severally liable for

the obligations owed to Produce Pay by Grupo Heres under the Grupo Heres 2021-22 Prepayment Agreement.

132. Star US and Star Global accepted the guaranty obligations of Addendum 2 by executing Addendum 2 to convince Produce Pay to wire funds under the Grupo Heres 2021-22 Prepayment Agreement with Grupo Heres, with the expectation that Star US and Star Global would benefit from the produce transactions involving the Berries conducted pursuant to the Distribution Agreement.

133. Pursuant to Addendum 2, Star US and Star Global each irrevocably and unconditionally guaranteed in favor of Produce Pay the prompt payment and performance of Grupo Heres.

134. Alternatively, Addendum 2 also represents a separate, stand-alone contractual obligation between Produce Pay and the Star Group Defendants.

135. Produce Pay performed its obligations under the Distribution Agreement and Addendum 2, executed the Grupos Heres 2021-22 Prepayment Agreement with Grupo Heres, provided the prepayment funds to Grupo Heres pursuant to the requirements, limitations and milestones of the Grupo Heres 2021-22 Prepayment Agreement, and the Berries were delivered to Star US.

136. Grupo Heres failed to perform its obligations to Produce Pay to reimburse funds owed to Produce Pay under the Prepayment Agreement and Addendum 2, resulting in a past due balance of $475,000.00.

137. Produce Pay is entitled to the recovery of attorney's fees and interest from the Star Group Defendants under the Distribution Agreement.

138. Produce Pay submitted demands for payment under the guaranty to Star US and Star Global on February 10, 2022 and April 29, 2022.

139. Star US and Star Global each have a contractual duty to reimburse Produce Pay for damages suffered due to the default by Grupo Heres.

140. Both Star US and Star Global have breached the contractual obligation

they jointly and severally owe to reimburse Produce Pay for the default of Grupo Heres pursuant to the Distribution Agreement and Addendum 2.

141.    Produce Pay has suffered damages in excess of $475,000.00, inclusive of contractual attorney's fees, costs, and interest, by virtue of the breach by the Star Group Defendants of the Distribution Agreement and Addendum 2.

WHEREFORE, Produce Pay respectfully seeks the entry of an Order providing as follows:

1.    Entering a Final Judgment in favor of Produce Pay and against Star US and Star Global, jointly, and severally, in an amount not less than $475,000.00, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action;

2.    A declaration that Produce Pay is entitled to reimbursement from Star US and Star Global for any failure of performance by a Producer who provides Produce which Star US or Star Produce receives under the Distribution Agreement; and

3.    Providing such other and further relief as the Court deems appropriate upon consideration of this matter, including a declaration that Produce Pay may enforce its Lien against Star US's debtors and assets, and against the debtors and assets of its alter ego, Star Global.

**COUNT III**
**Breach of Contract Pursuant to Initial $400K Guaranty**
**(As to the Star Group Defendants Only)**

142.    Produce Pay re-alleges paragraphs 1 through 141 as though fully set forth herein.

143.    As a condition of the Distribution Agreement as amended by the Initial $400K Guaranty, Star US and Star Global agreed to be jointly and severally liable for the obligations owed to Produce Pay by Grupo Heres under the Grupo Heres 2021-22 Prepayment Agreement.

144.    Star US and Star Global accepted the guaranty obligations of the Initial

$400K Guaranty by executing the Initial $400K Guaranty to convince Produce Pay to enter into the Grupo Heres 2021-22 Prepayment Agreement with Grupo Heres, with the expectation that Star US and Star Global would benefit from the produce transactions involving the Berries conducted pursuant to the Distribution Agreement.

145. Pursuant to the Initial $400K Guaranty, Star US and Star Global each irrevocably and unconditionally guaranteed in favor of Produce Pay the prompt payment and performance of Grupo Heres.

146. Also, the Initial $400K Guaranty also represents a separate, stand-alone contractual obligation between Produce Pay and the Star Group Defendants.

147. Produce Pay performed its obligations under the Distribution Agreement and the Initial $400K Guaranty, executed a Grupo Heres 2021-22 Prepayment Agreement with Grupo Heres, provided the prepayment funds to Grupo Heres, and the Berries were delivered to Star US.

148. Grupo Heres failed to perform its obligations to Produce Pay to reimburse funds owed to Produce Pay under the Grupo Heres 2021-22 Prepayment Agreement and the Initial $400K Guaranty, resulting in a past due balance of $475,000.00.

149. Produce Pay is entitled to the recovery of attorney's fees and interest from the Star Group Defendants under the Distribution Agreement.

150. Produce Pay submitted demands for payment under the guaranty obligation to Star US and Star Global on February 10, 2022 and April 29, 2022.

151. Star US and Star Global each have a contractual duty to reimburse Produce Pay for damages suffered due to the default by Grupo Heres.

152. Both Star US and Star Global have breached the contractual obligation they jointly and severally owe to reimburse Produce Pay for the default of Grupo Heres pursuant to the Distribution Agreement and the Initial $400K Guaranty.

153. Produce Pay has suffered damages in excess of $475,000.00, inclusive

of contractual attorney's fees, costs, and interest, by virtue of the breach by the Star Group Defendants of the Distribution Agreement and Addendum 2.

WHEREFORE, Produce Pay respectfully seeks the entry of an Order providing as follows:

1.    Entering a Final Judgment in favor of Produce Pay and against Star US and Star Global, jointly, and severally, in an amount not less than $475,000.00, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action;

2.    A declaration that Produce Pay is entitled to reimbursement from Star US and Star Global for any failure of performance by a Producer who provides Produce which Star US or Star Produce receives under the Distribution Agreement; and

3.    Providing such other and further relief as the Court deems appropriate upon consideration of this matter, including a declaration that Produce Pay may enforce its Lien against Star US's debtors and assets, and against the debtors and assets of its alter ego, Star Global.

**COUNT IV**
**Promissory Estoppel**
**(As to All Defendants)**

154.   Produce Pay re-alleges paragraphs 1 through 153 as though fully set forth herein.

155.   Defendants, individually and collectively, made a promise to Produce Pay in the Initial $400K Guaranty that the Star Group Defendants would guaranty the performance of Grupo Heres during the 2021-22 Season up to $400,000.00.

156.   The promise made by Defendants in the Initial $400K Guaranty induced Produce Pay to execute the Grupo Heres 2021-22 Prepayment Agreement and wire funds to Grupo Heres.

157.  Defendants made a promise, individually and collectively, to Produce Pay in Addendum 2 that the Star Group Defendants would guaranty the performance of Grupo Heres during the 2021-22 Season up to $600,000.00.

158.  The promise made by Defendants in Addendum 2 induced Produce Pay to wire funds to Grupo Heres.

159.  The reliance of Produce Pay on the Defendants' promise in the Initial $400K Guaranty was reasonable.

160.  The reliance of Produce Pay on the Defendants' promise in Addendum 2 was reasonable.

161.  Produce Pay has suffered damages as a result of relying on the promises of the Defendants in the Initial $400K Guaranty and Addendum 2 (the "Promises").

WHEREFORE, Produce Pay respectfully seeks the entry of an Order providing as follows:

1.  Entering a Final Judgment in favor of Produce Pay and against the Defendants, jointly and severally, in an amount not less than $475,000.00, plus prejudgment interest and costs of collection, including attorneys' fees, incurred in this action; and

2.  Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

**COUNT V**
**Breach of Good Faith and Fair Dealing Under PACA**
**(As to All Defendants)**

162.  Produce Pay re-alleges paragraphs 1 through 161 as though fully set forth herein.

163.  As a PACA licensee and dealer or broker of Produce, Star US, its agents, alter egos, and Principals possessed a statutory duty to deal with Produce Pay pursuant to a standard of honesty in fact and was further obligated to observe

commercial standards of fair dealing in the Produce trade, which is defined, inter alia, in Section 2 of PACA.

164.    The Star Group Defendants, and Bates and Maldonado individually, breached their obligation of good faith and fair dealing by, among other things, refusing to account to Produce Pay, withholding funds collected or received on behalf of Produce Pay, and failing to pay Produce Pay for the Produce shipments.

165.    As a direct and proximate cause of the wrongful conduct of Defendants, Produce Pay has been damaged in an amount not less than $600,000.00, plus further interest and all costs of collection, including attorneys' fees.

WHEREFORE, Produce Pay respectfully seeks the entry of an Order providing as follows:

1.    Entering a Final Judgment in favor of Produce Pay and against the Defendants, in an amount not less than $475,000.00, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

2.    Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT VI
### Alter Ego/Single Enterprise Liability
### (As to Defendant Star Global Only)

166.    Produce Pay re-alleges paragraphs 1 through 165 as though fully set forth herein.

167.    Star Global, by its complete exercise of dominion and control over Star US, is the alter ego of Company.  Star Global combines with Star US to constitute a single enterprise which they call "The Star Group," all under the direction and control of Star Global, Bates, Maldonado, and/or the other principals of Star Global. There is a high interdependency of operations; there is commonality between management, directors, and officers; there is a consolidation of financial, strategic,

website, sales, legal and human resources operations; and, at all relevant times, Star Global has used and continues to use Star US and the assets of Star US for its own purposes.

168.    As a direct and proximate cause of Star Global's wrongful conduct and control over the Star US, Produce Pay has been damaged in an amount not less than $475,000.00, plus further interest and all costs of collection, including attorneys' fees.

WHEREFORE, Produce Pay respectfully seeks the entry of an Order providing as follows:

1.    Entering a Final Judgment in favor of Produce Pay and against Star Global, in an amount not less than $475,000.00, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

2.    Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

### COUNT VII
### Conspiracy to Defraud
### (As to all Defendants)

169.    Produce Pay re-alleges paragraphs 1 through 168 as though fully set forth herein.

170.    Produce Pay is informed and believes, and based thereon allege, that the Defendants, and each of them, willingly and willfully conspired and agreed among themselves to perform the tortious and other wrongful acts and schemes set forth in this Complaint.  Defendants have recently stated that Bates and Maldonado lacked authority to execute agreements on behalf of Star US and/or Star Global, including the First Addendum and Addendum 2.  To the extent Defendants utilized unauthorized signers to mislead Produce Pay into advancing funds to Grupo Heres for consignment to Star US and Star Global, said acts and methods employed by the Defendants collectively, and each of them individually, constitutes a conspiracy

to defraud Produce Pay, breach certain fiduciary duties, misappropriate the Produce Pay's money, efforts, and experience, and to conceal their wrongful actions.

171.   As a direct and proximate cause of Defendants' wrongful conduct, Produce Pay has been damaged in an amount not less than $600,000.00, plus further interest and all costs of collection, including attorneys' fees.

WHEREFORE, Produce Pay respectfully seeks the entry of an Order providing as follows:

1.   Entering a Final Judgment in favor of Produce Pay and against each of the named Defendants, jointly and severally, in an amount not less than $600,000.00, plus prejudgment interest, punitive damages, and contractually due costs of collection, including attorneys' fees, incurred in this action; and

2.   Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

### COUNT VIII
### Breach of Contract as to Original Guaranty
### (As to Star US Only)

172.   Produce Pay re-alleges paragraphs 1 through 171 as though fully set forth herein.

173.   The obligations of Star US to Produce Pay for the transactions involving the Berries during the 2021-22 Season were governed by the Distribution Agreement.

174.   To the extent that the Promises are deemed unenforceable, the making of the Promises by agents of Star US constituted a fraud perpetrated by Star US against Produce Pay.

175.   The fraud perpetrated by Star US against Produce Pay constituted a breach of the Distribution Agreement.

176.   The Original Guaranty contained in Section 13.1 of the Distribution Agreement provides that Star US is responsible for 100% (one hundred percent) of

the obligations of Grupo Heres related to the Prepayment Agreement in event that Star US has committed fraud.

177.   Star US has not reimbursed Produce Pay as required by the Original Guaranty.

178.   Produce Pay has suffered damages due to the failure of Star US to honor the Original Guaranty.

WHEREFORE, Produce Pay respectfully seeks the entry of an Order providing as follows:

1.   Entering a Final Judgment in favor of Produce Pay and against the Defendants, in an amount not less than $475,000.00, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

2.   Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## **PRAYER FOR RELIEF**

WHEREFORE, Produce Pay prays that a judgment be entered in its favor as follows:

1.   A Final Judgment in favor of Produce Pay and against Defendants, in an amount not less than $475,000.00, plus all statutorily awarded interest and contractually due costs of collection, including attorneys' fees, incurred in this action;

2.   Produce Pay's attorneys' fees and costs all allowed by statute and/or contract;

3.   A declaration that Produce Pay is entitled to directly enforce any accounts receivable held by any receiver or debtor of Star US or its alter ego, Star Global, in order to satisfy the debt secured by the Lien;

4.   Any such other and further relief, including punitive damages for fraud, as the Court deems appropriate upon consideration of this matter

Dated: June 17, 2022

Respectfully submitted,
**MAURICE WUTSCHER LLP,**


/s/ Patrick J. Kane
Patrick Kane

*Attorneys for Plaintiff,*
*Produce Pay, Inc.*

# EXHIBIT A

DocuSign Envelope ID: E39277AD-51D5-4873-B34B-488A8A536185

*Produce Pay Template 1B*
*(Prepayment Agreement compatible)*

## DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this **"Agreement"**), is made as of the Effective Date set forth below between PRODUCE PAY INC., a Delaware corporation (**"Company"**), and the Distributor identified below the (**"Distributor"**).

Company has developed and made available an online software Platform to provide funding for growers, buyers and sellers of Produce as described, in part, in the Terms and Conditions (defined below). The Distributor and Company wish to enter into an agreement that memorializes the Distributor's use of the Platform and Company's provision of the Platform and any associated services, including, without limitation, the purchase and sale of Produce.

The parties hereby agree as follows:

1. Terms and Conditions. The Terms and Conditions attached hereto as Exhibit A ("**Terms and Conditions**") are incorporated herein by reference. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article 2 of the Terms and Conditions.

2. Transaction Terms. The following are the transaction terms (**"Transaction Terms"**) as used in the Terms and Conditions.

| | |
|---|---|
| *Distributor Name* | Star produce US LP |
| *Producer Name(s)* | SM INVERNADEROS S DE RL DE CV |
| *Distributor Address*<br>*Distributor City, State, Zip, Country* | <u>3380 Woods Edge Cir Ste 102.</u><br><u>Bonita Springs, FL 34134-1374</u><br>Phone: _____<br>Attn: _____<br>Email: |
| *Guaranteed Portion of Prepayment Agreement Obligations* | See section 13 |
| *Is Distributor granting a Prepayment Agreement security interest under Section 13?* | Yes |
| *Effective Date* | December 24, 2019 |

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**PRODUCE PAY INC.**

By: *Pablo Borquez Schwarzbeck*
    Name: Pablo Borquez Schwarzbeck
    Title: CEO

STAR PRODUCE
(Print Distributor Name)

By: _____
    Name: MATT BATES
    Title: PRESIDENT

<u>**Exhibit A**</u>

**Produce Pay Inc.**
**General Terms and Conditions**

These Terms and Conditions ("**Terms and Conditions**") are incorporated by reference into the Produce Pay Inc. Distribution Agreement to which they are attached. All Section and Article references in these Terms and Conditions shall be references to provisions in these Terms and Conditions unless explicitly stated otherwise. Capitalized terms used in these Terms and Conditions without definition shall have the meanings given to them in the Distribution Agreement to which they are attached. All references to "this Agreement" shall mean the Distribution Agreement to which these Terms and Conditions are attached, together with these Terms and Conditions incorporated therein.

1.    <u>**THE PLATFORM**</u>

Company has developed and made available an online software platform to provide funding for growers, buyers and sellers of Produce that operates, in part, in the following manner (which manner of operation may be changed by Company from time to time in its sole discretion):

(a)    The Distributor shall log into the Platform to notify Company that a Producer has shipped a Distributed Asset Pool to the Distributor.

(b)    The Producer will be an approved and registered Producer on the Platform under which the Distributor can accept or reject a Distributed Asset Pool.

(c)    The Distributor shall notify Company of its acceptance or rejection of shipment of such Distributed Asset Pool as satisfactory for sale by the Distributor to retailers or wholesalers under the terms of this Agreement. The Distributor will accept the shipment in the Platform and attach shipping documents to the shipment to verify case quantities. All rejected Produce shall not be included in a Distributed Asset Pool and shall be removed from the Platform.

(d)    At its sole discretion, Company can then, upon such notification by the Distributor of acceptance of a Distributed Asset Pool through said Platform, remit a first payment to the Producer and take title to the Distributed Asset Pool.

(e)    Upon Company taking title to the Distributed Asset Pool through the Platform, the Distributor will thereby be required to remit to the Company the Net Sale Proceeds for such Distributed Asset Pool.

(f)    With respect to each Distributed Asset Pool, upon shipment and invoicing of such Distributed Asset Pool, Distributor shall calculate and notify Company via the Platform of the Gross Sale Proceeds from the retailer or wholesaler for such Distributed Asset Pool, the Distributors Commission and the Distributor Deductions thereon, and shall attach the invoice for such sale.

(g)    Upon request from Producer, the Company in its sole discretion may make an additional purchase price payment to the Producer through the Platform after the

Distributor has sold the Produce and entered the information required above into the Platform.

(h)    With respect to each Distributed Asset Pool, upon receipt of notification from the Distributor of the shipment and invoicing of such Distributed Asset Pool Company through the Platform, Company shall calculate and notify the Distributor of the Company Proceeds and the Net Sale Proceeds, as well as any Deficit and Excess Deficit.

(i)    Distributor will then pay Company the Net Sale Proceeds for such Distributed Asset Pool and the Excess Deficit, if any, for any other Distributed Asset Pool.

(j)    The Distributor acknowledges and agrees that Company is a bona fide purchaser acting in good faith with respect to all of its interactions with the Distributor, including, without limitation, all transactions contemplated by this Agreement; the Distributor further acknowledges and agrees that all amounts due and owing to Company in connection with this Agreement, including, without limitation, the Company Expenses, and any other commissions, fees and amounts received by Company in connection with a Distributed Asset Pool are duly earned obtained for fair and reasonable value from the Distributor.

(k)    Under Prepayment Agreements (defined below), Company will from time to time advance to Producers who are parties to such Prepayment Agreements amounts referred to as the Prepaid Asset Pool Purchase Price (as defined in such Prepayment Agreements). The Distributor is guaranteeing hereunder the repayment of all payments due to Company under the Prepayment Agreements and is agreeing to pay to Company hereunder a portion of the Gross Proceeds from any related sales of Produce equal to the Prepayment Recovery Deduction as set forth in the respective Prepayment Agreement (the "**Prepayment Recovery Deduction**") until Company has recovered therefrom the Prepayment Asset Pool Purchase Price (as defined in the applicable Prepayment Agreement), and all other Prepayment Agreement Obligations (defined below), as well as paying any Excess Deficit related thereto (as defined below).

## 2.    <u>DEFINITIONS; CONSTRUCTION</u>

2.1    <u>Definitions</u>. Capitalized terms used in this Agreement shall be defined as follows:

"**Affiliate**" of a Party means any corporation, limited liability company, partnership or other legal entity that controls, is controlled by, or is under common control with such Party. For the purposes of this definition, an entity shall be deemed to control another entity if it owns or controls directly or indirectly at least fifty-one percent (51%) of the voting equity or assets of the other entity (or other comparable ownership interest for an entity other than a corporation).

"**Asset Pool**" means Produce sold in one or more allotments from a Producer to the Company.

"**Company Expenses**" means, with respect to each Distributed Asset Pool, all liabilities and expenses of every kind and character incurred by Company in the enforcement of its rights under this Agreement or the collection of any payments owed by Distributor, including, without limitation, all liabilities, interest, costs and

fees, arising under or from any credit agreement, forward purchase agreement, note, bill of sale, open account, overdraft, credit card, lease, endorsement, surety agreement, guaranty, acceptance, foreign exchange contract or depository service contract, whether payable to Company or to a third party and subsequently acquired by Company, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing.

**"Company Proceeds"** means, with respect to each Distributed Asset Pool, the amount that the Company is entitled to receive under the Produce Purchase Agreement and the Prepayment Agreement with respect to such Distributed Asset Pool, including without limitation the Prepayment Recovery Deductions and the following (each as defined in the respective Produce Purchase Agreement): Asset Pool Purchase Price, Sales Commission, Company Expenses and Application Fee.

**"Deficit"** has the meaning set forth in Section 6.2.

**"Distributed Asset Pool"** means with respect to any Asset Pool, the portion or amount of such Asset Pool actually sold and distributed, on a consignment basis, by the Distributor.

**"Distributor's Commission"** means the commission payable to a Distributor under a Producer Agreement with respect to the sale and distribution of a Distributed Asset Pool.

**"Distributor Deductions"** means any and all (a) deductions from proceeds of the sale and distribution of a Distributed Asset Pool the Distributor deems appropriate in its business judgment and in accordance with the applicable Producer Agreement or other governing agreement and (b) taxes, fees, commissions and other amounts assessed by parties other than the Distributor or Company on account of the sale and distribution of a Distributed Asset Pool to the extent that such amounts have been actually paid by (or will contemporaneously be paid by) a Distributor out of proceeds from such sale. Producer acknowledges that Company is not responsible for the determination or verification of Distributor Deductions.

**"Excess Deficit"** has the meaning set forth in Section 6.2.

**"Gross Sale Proceeds"** means the proceeds invoiced by the Distributor on behalf of Company for the sale of a Distributed Asset Pool, without deduction of any kind.

**"Net Sale Proceeds"** means the Gross Sale Proceeds for a particular Distributed Asset Pool less (a) the Distributor's Commission for that Distributed Asset Pool, and (b) the Distributor Deductions for that Distributed Asset Pool, as (a) and (b) are limited by the application of Section 6.2 hereof.

**"Party"** refers to Company or the Distributor, and **"Parties"** shall collectively refer to both Company and the Distributor.

**"Platform"** means, the software platform and software as a service solution provided by Company to the Distributor and other parties with respect to any Asset Pool, that enables (a) such Asset Pool to be purchased by Company via the Platform, and (b) all funds owed by Distributor to Company to be remitted electronically via the Platform.

**"Prepayment Agreement"** means an agreement between the Company and a Producer relating to the prepayment for a Distributed Asset Pool by the Company.

**"Prepayment Agreement Obligations"** means all liabilities of a Producer to Company under the Prepayment Agreement, now existing and hereafter incurred, including without limitation the Prepayment Sales Commission. Prepayment Recovery Deduction, Late Payment Fee, and payments owed for failure to meet Performance Milestones by the Milestones Deadlines (as such terms are defined in the applicable Prepayment Agreement).

**"Produce"** means all products, items and goods, including, but not limited to, fruits, vegetables, grains, root, crops of the forest, in their natural or unprocessed states and in all of their respective varieties, that constitute "perishable agricultural commodities" as defined in the Perishable Agricultural Commodities Act, 1930 (**"PACA"**) (7 U.S.C. 499a(4)).

**"Produce Purchase Agreement"** means an agreement between the Company and a Producer relating to the purchase of a Distributed Asset Pool by the Company.

**"Producer"** refers to any party from which Company acquires Produce that is sold by Distributor under this Agreement.

**"Producer Agreement"** means an agreement between the Distributor and a Producer relating to the sale of a Distributed Asset Pool by Distributor, on a consignment basis.

**"Term"** means the period commencing on the Effective Date and ending on the date that is one year from the Effective Date, and the term shall be automatically extended for consecutive one (1) year periods on each anniversary of the Effective Date, unless either party shall have provided written notice of termination to the other party not less than thirty (30) days prior to the expiration of the current term Effective Date.

## 3.    APPOINTMENT; GENERAL CONSIGNMENT TERMS

3.1    Nonexclusive Appointment.  Subject to the terms and conditions of this Agreement, Company hereby appoints the Distributor as its nonexclusive distributor to sell the Produce in a final form for fresh market shipment and purchase by the applicable grocer, other retailer or permitted third party.  It is specifically understood and agreed that this appointment is nonexclusive in nature and that nothing herein contained shall be construed to grant the Distributor any exclusive rights.

3.2    Title to Produce.  Title to the Produce will remain with Company until such Produce has been sold, on a consignment basis, on its behalf by the Distributor and the Produce has been accepted by the applicable grocer, other retailer or other purchaser. The Distributor represents and warrants that (a) the shipment and consignment of the Produce by Company to the Distributor under this Agreement does not violate any agreement or covenant of the Distributor with any lender or other third party, and (b) the Produce shall be free from any and all liens, encumbrances, charges and security

interests arising by, through or under the Distributor.  In furtherance of the foregoing, the Distributor shall notify all of its lenders and other creditors, both secured and unsecured, of the fact that the Produce is the property of Company, regardless of whether such Produce is in the possession of the Distributor or any accounts payables issued in connection with such Produce are in the name of the Distributor.  Accordingly, the Distributor agrees to coordinate with its lenders and other creditors to carve-out or otherwise remove the Produce, all proceeds and related assets thereof from any security interests and liens granted by the Distributor to any such lender or other creditor of the Distributor and to provide Company with evidence of any such carve-out.

3.3     Relocation or Name Change.  The Distributor shall provide Company with written notice at least thirty (30) calendar days prior to the Distributor's change of name or location.

## 4.     **OBLIGATIONS**

4.1     Inventory.  The Parties acknowledge that the Producer will ship the Produce directly to the Distributor and that Company will not be responsible for maintaining any inventory.

(a)     The Distributor shall store any Produce inventory in accordance with the highest industry practice in order to preserve and protect the Produce. Towards this end, the Distributor shall store inventory in designated storage areas in a manner appropriate for maintaining such Produce in good and saleable condition as required by Produce labeling specifications and storage conditions specified by Company and market conventions.

(b)     Within ten (10) days' prior notice, Company or its representative shall have the right to visit or assess all locations where the Distributor maintains or ships inventory of Produce to conduct a quality assurance audit of such facilities and/or an on-site surveillance of its inventory storage tracking.  In the event that an audit reveals matters that Company determines should be corrected by the Distributor, Company shall provide, in writing a list of such matters and any proposed corrective action to be taken by the Distributor.  The Distributor shall respond within fifteen (15) days thereafter of the corrective action to be taken by the Distributor and an estimated completion date.

4.2     Invoices. The Distributor acknowledges and agrees that any misrepresentations or other fraudulent activity of the Distributor with respect to any invoice or other proof of sale submitted by the Distributor to Company shall be prosecuted to the fullest extent of all applicable statues, regulations and other laws.

4.3     Promotion of Produce. The Distributor shall be responsible for all promotional and marketing activities that the Distributor undertakes related to the sales and distribution of the Produce.

4.4     Accuracy of Data in Platform. Distributor is responsible for validating accurate information into the Platform. Information that is the responsibility of the Distributor includes but is not limited to: commodity type, unit of measure, items per unit, units. Any errors or costs resulting from inaccurate information that is validated as accurate by the Distributor will be at the cost to the Distributor

4.5   Complaints.   The Distributor shall promptly forward to Company any customer complaints or comments concerning the Produce.   For any customer complaint, the Distributor shall send Company the nature of the complaint.   The foregoing information shall be communicated in written form (e-mail, fax or express mail).

4.6   Limitation of Liability.   COMPANY SHALL NOT BE LIABLE FOR ANY DAMAGES CAUSED BY THE CONSUMPTION OF THE PRODUCE. FURTHER, COMPANY'S LIABILITY ARISING OUT OF THIS AGREEMENT, THE TERMINATION THEREOF, AND/OR SALE OF THE PRODUCE SHALL BE LIMITED TO $1,000.   COMPANY SHALL NOT BE LIABLE TO THE DISTRIBUTOR OR ANY OTHER PARTY FOR ANY DAMAGES CAUSED BY FAILURE TO MAKE SHIPMENT ON ANY ORDER OR CONTRACT OR FOR DELAY IN DELIVERY OF ANY PRODUCE.   IN NO EVENT SHALL COMPANY BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS, LOST PROFITS OR ANY OTHER SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING OUT OF THIS AGREEMENT. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED HEREIN OR IN THE WARRANTY FOUND IN THE PRODUCE.

4.7   Basic Business Terms and License.   Company shall operate the Platform as set forth in Section 1 and the Distributor shall use the Platform as set forth in Section 1, in each case as such Platform and the operation thereof may be modified by the Company from time to time.   Company grants the Distributor the non-exclusive right and license to use the Platform as provided for under the terms of this Agreement.

## 5.   COVENANTS

5.1   Trademarks.   The Distributor shall not: (i) register or attempt to register any trademarks, copyrights and trade names of Company (collectively, the **"Trademarks"**) in any jurisdiction; (ii) adopt or register any trademark, trade name or domain name which is confusingly similar to any of the Trademarks; (iii) incorporate any Trademarks into the Distributor's corporate name; or (iv) represent in any manner that it has any ownership in the Trademarks or registrations thereof.

5.2   Intellectual Property.

(a)   The Distributor agrees that Company owns all right, title, and interest in the Platform and Company's rights to letters patents, Trademarks, other trademarks, registrations and approvals, inventions, copyrights, know-how, trade secrets and other intangible property concerning Produce (collectively, **"Intellectual Property"**) and the Distributor shall acquire no rights in any Intellectual Property.   The use by the Distributor of any of Intellectual Property is authorized only for the purposes herein set forth, and upon termination of this Agreement for any reason such authorization shall cease.

(b)   The Distributor hereby irrevocably assigns to Company any right of title or interest that the Distributor may have or acquire in any modifications, designs or improvements of Company's Intellectual Property by its employees or agents.

    (c)    The Distributor shall not dispute or contest or assist others to dispute or contest the validity of any of Company's Intellectual Property. In addition, if the Distributor so disputes or contests or assists others to dispute or contest the validity of any of Company's Intellectual Property, Company shall have the right to terminate this Agreement immediately upon written notice to the Distributor.

    (d)    The Distributor shall promptly and fully notify Company of any actual, threatened or suspected infringement of any Intellectual Property of Company which comes to the Distributor's attention.

5.3    <u>Compliance with U.S. Sanctions Regulations</u>.  The Distributor understands and acknowledges that Company is subject to regulation by agencies of the U.S. Government, including but not limited to, the U.S. Department of Treasury which prohibit the sale, export or diversion of produce to certain countries, including, as of the Effective Date, Iran, Syria, Myanmar (Burma), North Korea, Sudan and Cuba. The Distributor hereby warrants that it shall not sell, directly or indirectly, any Produce to customers which it knows or reasonably should know will resell or export the Produce to parties in the above named countries.

5.4    <u>Indemnification</u>.

    (a)    The Distributor agrees to defend, indemnify and hold Company harmless for any and all claims, counterclaims, costs, liabilities and responsibilities, regardless of the claimant or its place of filing a claim, relating to or arising from: (i) the functioning or performance of the Distributor as the distributor, supplier and seller of the Produce supplied to the Distributor by Company, (ii) any taxes assessed with respect to the sale and distribution of any Distributed Asset Pool, to the extent not otherwise paid by the Distributor, (iii) any action or omission by the Distributor which results in the imposition of any lien, consignment to a third party, encumbrance, security interest or charge with respect to the Distributed Asset Pool that has been sold to Company, (iv) any breach by Distributor of any representation, warranty or covenant in this Agreement, and (v) any damage or injury caused by the Produce, including any product liability claims or recall costs. The Distributor shall be the warrantor or guarantor of the safety, operation and performance of the Produce covered by this Agreement to whatever extent such a warranty or guarantee is made by the Distributor that exceeds the warranty or guarantee on the Produce given by Company.

    (b)    Company shall defend, indemnify and hold harmless the Distributor and its officers, directors, employees, agents, subsidiaries and other affiliates from and against any and all potential claims or actual third party claims, damages, costs, liability, and expense whatsoever (including reasonable attorneys' fees) relating to or arising from: (i) the failure of any representation or warranty of Company made hereunder to be true and correct when made, and (ii) claims that the Platform infringes upon the intellectual property rights of any third party.

## 6.    **TERMS AND CONDITIONS OF SALES**

6.1 <u>Payment to Company</u>. Upon the sale of a Distributed Asset Pool, the Company is entitled to receive, and Distributor will promptly remit to Company, an amount equal to the Net Sale Proceeds.

6.2 <u>Deficit</u>. If for a particular Distributed Asset Pool (A) the amount that the Company is entitled to receive as Company Proceeds under the Produce Purchase Agreement (including the amount that the Company is entitled to receive as a Prepayment Recovery Deduction under the applicable Prepayment Agreement, if any, or other amounts owed under the applicable Prepayment Agreement) exceeds (B) the amount of the Gross Sale Proceeds less the Distributor's Commission and Distributor Deductions (the amount of such excess, the "**Deficit**"), then the amount of Distributor's Commission and Distributor Deductions that the Distributor may withhold from the Gross Sale Proceeds before transferring the proceeds from such Distributed Asset Pool to the Company shall be limited as follows:

(a) If the Deficit is less than the sum of the Distributor's Commission and Distributor Deductions for such Distributed Asset Pool, then the amount of Distributor's Commissions and Distributor Deductions that the Distributor may withhold from the Gross Sale Proceeds shall be reduced by the amount of the Deficit.

(b) If the Deficit is greater than or equal to the sum of the Distributor's Commission and Distributor Deductions for such Distributed Asset Pool, then (i) the Distributor may not withhold any Distributor's Commissions or Distributor Deductions from the Gross Sale Proceeds and shall pay the entire Gross Sale Proceeds to the Company (in which case, the Net Sale Proceeds shall equal the Gross Sale Proceeds for all purposes hereof), (ii) to the extent that the Company Proceeds exceed the Gross Sale Proceeds (the "**Excess Deficit**"), then the Company shall be entitled to receive from the Distributor, on a first-priority basis, the entire Gross Sale Proceeds for any other Distributed Asset Pools purchased by Company from the Producer, until such time as the Excess Deficit, together with any and all outstanding fees and charges owed to the Company by the Producer and/or the Distributor, are satisfied in full, and (iii) the Company may at any time demand payment from the Distributor of an amount equal to the Excess Deficit plus, to the extent not otherwise included in the Excess Deficit, any other outstanding Prepayment Agreement Obligations. The foregoing collection demand may be made by the Company first to the Distributor without attempting to collect any amount from the Producer.

6.3 <u>Taxes</u>. The Gross Sale Proceeds does not include any foreign, federal, state or local taxes that may be applicable to the Produce, including sales, excise, value-added, withholding, and other taxes, which shall be the responsibility of the Distributor. Each party shall be solely responsible for any taxes imposed on it based upon its net income.

6.5 <u>Receivables Risk</u>. The Distributor shall bear all default risk of any purchaser of the Produce. As such, Distributor shall compensate Company based on the first invoiced Gross Sale Proceeds even if a grocer, retailer or other purchaser or end user defaults on payment after having taken possession of the Produce.

**7.   REGULATORY MATTERS**

7.1     <u>Notice of Certain Events</u>.  Each Party shall promptly notify the other after it becomes aware of any of the following events:  (a) alleged infringement of the Trademarks or Intellectual Property applicable to the Platform by any third party; (b) alleged infringement of the trademark, patent or proprietary rights of others in connection with actions taken hereunder; (c) liability claims relating to the Produce; (d) any correspondence exchanged with federal or local authorities regarding the distribution of the Produce; and (e) any other event that may reasonably be expected to have a material adverse effect upon the sale or distribution of the Produce.

7.2     <u>Traceability</u>. Each Party shall maintain such traceability records with respect to the Produce as shall be necessary to comply with applicable statues, regulations and other law.

7.3     <u>Recall or Advisory Actions</u>.

    (a)     In the event of a recall of any Produce as a result of any governmental action, the Distributor shall notify Company in writing in a timely manner upon making such recall.

    (b)     The Distributor shall have and maintain at all times defined procedures to facilitate corrective action, including the actions described in this Section 7.3, and the Distributor shall bear the cost of all such corrective action and any and all liability associated with a Produce recall.

**8.     <u>PROPRIETARY     INFORMATION;     NON-COMPETITION,     NON-SOLICITATION AND NON-DISPARAGEMENT</u>**

8.1     <u>Confidentiality</u>. The Distributor shall strictly maintain and shall cause its officers, directors, employees, and agents to so maintain, the confidentiality of the terms of this Agreement and any trade secrets, know-how, producer lists, financial information or other proprietary information of Company or its affiliates which is not a matter of public knowledge, which, for the avoidance of doubt, shall include information regarding the operation of the Platform and any documentation thereof (collectively, the **"Proprietary Information"**) during the Term of this Agreement and for two (2) years thereafter (such period, the **"Restricted Period"**).  For purposes hereof, Proprietary Information shall not include information disclosed by Company or its Affiliates to the Distributor which the Distributor can establish (a) was known by the Distributor or any of its divisions, subsidiaries or affiliates prior to the date thereof; (b) was received by the Distributor from a third party having the lawful right to disclose such information; or (c) is in the public domain through no fault of the Distributor or its officers, directors, employees, affiliates or agents.  The Distributor shall not make or retain any copies of any Proprietary Information that may have been entrusted to it and shall use Proprietary Information solely for purposes of exercising its rights and carrying out its obligations under this Agreement.  Upon termination of this Agreement for any reason, the Distributor shall immediately cease using any Proprietary Information.

8.2     <u>Non-competition, Non-solicitation and Non-disparagement</u>.  The Distributor shall not:

    (a)     during the Restricted Period, directly or indirectly, own, operate, manage, control, participate in, be employed by, consult with, advise or engage in services for any person or entity engaged in Company's business of providing

an online software platform to facilitate funding for growers, buyers and sellers of Produce;

(b)    during the Restricted Period, directly or indirectly induce or attempt to induce any customer, client, vendor, supplier or other business relation of or to the Company or any of its Affiliates, to cease doing business with the Company or any of its Affiliates, to reduce or otherwise adversely change its business with the Company or any of its Affiliates, or in any other way deliberately interfere with the relationship between the Company or any of its Affiliates, on the one hand, and any such customer, client, vendor, supplier or other business relation, on the other hand; or

(c)    directly or indirectly, make any written or oral statement concerning the Company that is harmful to the Company, its business or the business reputation of the Company.

8.3    <u>Injunctive Relief</u>.  Given the nature of the Proprietary Information and the other matters covered in this Article 8, the Parties agree that monetary damages may not be a sufficient remedy for any breach of this Article 8.  In addition to all other remedies, Company shall be entitled to seek specific performance and injunctive and other equitable relief as a remedy for any breach or threatened breach of this Article 8.

## 9.    TERM AND TERMINATION

9.1    <u>Term</u>.  Unless terminated pursuant to this Section 9.1, this Agreement shall remain in effect during the Term.  Company retains the right to terminate this Agreement and its obligations hereunder to the Distributor at any time upon written notice to the Distributor, subject to payment of all amounts owed as per the terms of this Agreement to the Distributor.  The Distributor may terminate its use of the Platform and this Agreement on a going forward basis, but shall not be able to terminate any transactions for Distributed Asset Pools wherein Company has already paid the Producer for that Produce and, provided, further, that immediately upon such date of termination, the Distributor shall no longer be entitled to access the Platform (and the non-exclusive license granted to the Distributor to use the Platform in Section 4.7 shall be immediately revoked) with respect to Distributed Asset Pools that have not already been sold to Company.

9.2    <u>Effect of Expiration or Termination</u>.

(a)    <u>Payments</u>.  Expiration or termination shall not relieve either Party of its requirement to pay any sums accrued and owed to the other Party under the terms of this Agreement as of the date of expiration or termination.

(b)    <u>Records</u>.  At the request of the Company for the purpose of settling outstanding balances, the Distributor shall deliver to Company copies of all sales records for the previous one (1) year within thirty (30) days of termination of this Agreement.  From the time that notice of termination is received by either Party until the effective termination date, the Distributor shall notify Company in writing of all Produce inquiries.

(c)    <u>No Extension</u>.  Company's acceptance of any purchase order from the Distributor, or sale or license of any Produce to the Distributor after the effective date of expiry or termination of this Agreement shall not be

construed as a renewal or extension hereof, or as a waiver of expiry or termination of this Agreement.

(d)    Survival.  Sections 4.5, 4.6 and 7.3 and Articles 5 and 8-13 will survive termination of this Agreement, together will all payment obligations to the Company for services provided hereunder or that otherwise accrued during the Term.

**10.    MISCELLANEOUS**

10.1    Notices.  All notices or other communication required or permitted to be given pursuant to this Agreement shall be addressed to Distributor at the address provided in the Transaction Terms or to the Company at its principal offices. All notices under this Agreement shall be deemed to have been duly given or made if sent by one of the following means: (i) electronically through the Platform or through an email address provided in this Agreement; (ii) registered or certified U.S. or national mail service mail, return receipt requested; (iii) hand delivered; or (iv) sent by prepaid overnight courier such as Federal Express.  Each notice or other communication shall be deemed to have been given or made on the date of actual receipt by the recipient. Either party may give to the other written notice of change of address, in which event any communication shall thereafter be given to such party as above provided at such changed address.

10.2    Assignment.  This Agreement shall not be assigned or delegated by the Distributor in whole or in part without the prior written consent of Company, which may be withheld by Company in its sole discretion.

10.3    Waiver; Severability. Failure by either party to enforce a provision of this Agreement shall not constitute a waiver of that or any other provision of the Agreement.  If one or more provisions of this Agreement are held to be unenforceable under applicable statute, regulation or other law, Company and the Distributor shall renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each Party as close as possible to that under the provision rendered unenforceable.  If Company and the Distributor cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of this Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of the Agreement shall be enforceable in accordance with its terms.

10.4    Independent Contractors.  Nothing contained in this Agreement shall be construed (a) to give either Party the power to direct or control the day to-day activities of the other or (b) to constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking.  The Distributor shall not enter into any contract or commitment on behalf of Company without the prior written approval of Company.

10.5    Governing Law.

(a)    Governing Law.  This Agreement and all documents, agreements, contracts and instruments executed in connection herewith shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflict of laws provisions that would require the

application of the laws of another jurisdiction. Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

(b)    Consent to Jurisdiction. The Parties hereby irrevocably submit to the non-exclusive jurisdiction of any United States federal court or Delaware state court located in Delaware in any action or proceeding arising out of or relating to this Agreement or any documents executed in connection herewith and the Parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in any such United States Federal Court or Delaware state court. Each Party irrevocably consents to the service of any and all process in any such action or proceeding brought in any court in or of the State of Delaware by the delivery of copies of such process to it at the applicable addresses specified on the signature page hereto or by certified mail directed to such address or such other address as may be designated by it in a notice to the other parties that complies as to delivery with the terms of Section 10.1.

10.6    Entire Agreement. This Agreement, and any collateral agreements required or assented through the Platform, including any related Produce Purchase Agreements, sets forth the sole understanding and agreement of the Parties hereto with respect to the subject matter hereof and supersedes all other prior and contemporaneous discussions, negotiations agreements and understandings, whether written or oral, between them. It is specifically agreed that no printed standard terms that may appear on any quotations, purchase orders, acceptance notes or invoices relating to the Produce in this Agreement shall have any effect.

10.7    Amendments. No modification of this Agreement or of any covenant, condition or limitation contained herein shall be valid or effective unless it is (a) in writing and duly executed by the parties hereto, or (b) electronically accepted by Distributor on the Platform. Distributor's continued use of the Platform after notification of modifications of this Agreement by Company via the Platform will be deemed electronic acceptance by Distributor hereunder.

10.8    Headings. The headings used in this Agreement have been added for the convenience of the Parties and shall not affect the meaning, construction or interpretation of any provision hereof.

10.9    Counterparts. This Agreement may be executed by PDF or facsimile, email, electronic signature (such as DocuSign or EchoSign), or through electronic acceptance through the Platform, and in one or more counterparts, each of which shall constitute a duplicate original of this Agreement but together shall constitute one and the same instrument.

10.10   Attorneys' Fees. in any action arising out of or relating to this Agreement, the non-prevailing party will pay the substantially prevailing party's reasonable attorneys'

fees, costs, and necessary disbursements, whether or not the action is prosecuted to award or judgment.

10.11  <u>Electronic Credit and Debit Authorization</u>. Distributor irrevocably authorizes the Company to initiate electronic credit or debit entries to Distributor's account on file with the Company at any time and without regard to the source of any monies in such account for any amount owed to the Company under this Agreement if such amount is not paid within fifteen (15) calendar days of the date such payment was due. As a condition to the Company entering into this Agreement, Distributor shall provide the bank at which its account is held with any and all approvals, consents or other permissions which may be necessary in order for such bank to pay direct debits to the Company. This authority will remain in full force and effect until (a) the Company notifies the bank that all monies due to the Company under this Agreement have been paid in full; or (b) the parties have otherwise agreed in writing to terminate this authorization. the Company may levy an administrative charge if a direct debit for any charge is returned unpaid.

10.12  <u>Privacy Policy</u>. Distributor hereby consents to the Company's privacy policy, located at https://producepay.com/privacy/, which describes Company's privacy practices and is incorporated by reference into this Agreement. By Distributor's continuing use of the Platform, Distributor consents to any updates to the Company's privacy policy that may be published on the Company's website or the Platform from time to time.

10.13  <u>Blue Book Scores</u>. Distributor hereby acknowledges and agrees that if it accesses any Blue Book Services, Inc. proprietary credit scores through use of the Platform, it shall use those credit scores solely for its own purposes and not share them with any third party.

10.14  <u>Insurance</u>. Without limiting any obligations under this Agreement, Distributor will, at its sole cost and expense, procure and maintain in effect at all times during the term of this Agreement, and for the statutory period for which Distributor may be liable for defects or other liabilities arising out of the Agreement, including liability relating to the Produce, Commercial General Liability Coverage as a food broker of at least $1,000,000 per occurrence and $2,000,000 in the aggregate. Distributor will name Company as an additional insured and will provide certificates evidencing such insurance within 30 days of the Effective Date and each anniversary of the Effective Date through the term of this Agreement.

## 11.  <u>REPRESENTATIONS AND WARRANTIES</u>

11.1  <u>By Distributor</u>. The Distributor hereby represents and warrants to Company, as of the Effective Date and as of the date of each purchase of a Distributed Asset Pool by the Company hereunder, as follows:

      (a)  it is duly organized, validly existing and in good standing under the laws of its state of its incorporation and has the power and authority to enter into this Agreement and to fully perform its obligations hereunder;

      (b)  this Agreement has been executed by its duly authorized representative and constitutes its valid, binding obligation;

(c)    that the Producer it is sourcing Produce from owns sufficient rights in the Produce to be able to transfer title to each Distributed Asset Pool to be conveyed or as has been conveyed to Company;

(d)    the Produce is of merchantable quality, fit for its particular purpose;

(e)    each Distributed Asset Pool to be conveyed or as has been conveyed to Company is the exclusive property of the Producer and is not subject to any lien, consignment arrangement, encumbrance, security interest, charge, filing with a personal property registry or any financing statement whatsoever;

(f)    the Produce that comprises any Distributed Asset Pool to be conveyed or as has been conveyed to Company complies with all applicable laws, statutes, regulations and judgments, including, if applicable, all requirements of the United States Food and Drug Administration and the United States Department of Agriculture; and

(g)    it has all licenses, permits, consents or approvals (including, without limitation, all import licenses, registrations and permits) from or by, and has made all filings with, and has given all notices to, all governmental authorities having jurisdiction, to the extent required for it to sell the Produce on a consignment basis hereunder.

11.2   <u>By Company</u>. Company hereby represents and warrants to the Distributor as follows:

(h)    it is duly organized, validly existing and in good standing under the laws of its state of its incorporation and has the power and authority to enter into this Agreement and to fully perform its obligations hereunder; and

(i)    this Agreement has been executed by its duly authorized representative and constitutes its valid, binding obligation.

## 12.   <u>PROBIHITION ON USE OF PROCCEEDS AS COLLATERAL</u>

`12.1   The Distributor hereby acknowledges that during the duration of this Agreement it cannot use as collateral with any creditors its accounts, accounts receivables or any proceedings from the sale of Produce (including insurance, general intangibles and other accounts proceeds).

`12.2   The Distributor hereby acknowledges that it will not accept any Distributed Asset Pool in the platform if such Distributed Asset Pool, or its proceeds, will become collateral by a creditor of any type.

## 13.   <u>GUARANTY; SECURITY INTEREST</u>

13.1 <u>Guaranty</u>. Distributor absolutely, unconditionally and irrevocably guarantees to Company the due and punctual payment, performance and discharge of the Guaranteed Portion (defined below) of the Prepayment Agreement Obligations. This guaranty is a guaranty of prompt and punctual payment of the Prepayment Agreement Obligations, and is not merely a guaranty of collection. These obligations are independent of Producer's obligations and separate actions may be brought against Distributor. **"Guaranteed Portion"** means from the Producer's Prepayment

Agreement 1) 2,161,007 of Estimated Number of Cases of Produce multiplied by 2) the **8.75% guaranty** multiplied 3) by a minimum of $10.58 Net Sale Proceeds per case ; provided, however, that in the event of fraud by the Distributor in any matters related to the Prepayment Agreement, this Agreement or the Distributed Asset Pools, the Guaranteed Portion shall be 100%.

13.2 <u>Grant of Security Interest</u>. If the Transaction Terms indicate that the Distributor is granting a Prepayment Agreement security interest under this Section 13, the Distributor hereby grants to the Company a first priority perfected security interest in all of Distributor's right, title and interest, whether now owned or hereafter acquired, in, to and under Collateral (as defined below) to secure payment of the Prepayment Agreement Obligations.

13.3 <u>Definition of Collateral</u>. "Collateral" means all of Distributor's right, title and interest, in, to and under all personal property and other assets of whatever kind or nature, whether now owned or existing or hereafter arising or acquired, wherever located, including, without limitation, all of Distributor's right, title and interest, in, to and under: (a) all goods and equipment, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located; (b) all inventory, including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Distributor's books relating to any of the foregoing; (c) all contract rights and general intangibles, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind; (d) all accounts, contract rights, royalties, license rights and all other forms of obligations owing to Distributor arising out of the sale or lease of goods, the licensing of technology or the rendering of services by Distributor, whether or not earned by performance, and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Distributor and Distributor's books and records relating to any of the foregoing; (e) all documents, cash, deposit accounts, securities, financial assets, securities accounts, securities entitlements, letters of credit, certificates of deposit, instruments and chattel paper and Distributor's books and records relating to the foregoing; and (f) all claims, rights and interests in any of the above and, all substitutions for, additions and accessions to and proceeds thereof.

13.4    <u>Financing Statement</u>. The Distributor authorizes the Company to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Company may determine, or the Company may, at its option, file financing statements or similar records containing any collateral description which reasonably describes the Collateral, and the Distributor will pay the cost of filing them in all public offices where filing is deemed by the Company to be necessary or desirable.

DocuSign Envelope ID: F39277AD-51D5-4873-B34B-488A8A536185

*End of General Terms and Conditions*

WEST\280725341.6

# EXHIBIT B

<u>**ADDENDUM**</u>

    The Company (PRODUCE PAY , INC.) and Distributors (STAR PRODUCE US LP and STAR PRODUCE LTD) are parties to a Distribution Agreement dated December 24, 2019 (the "**Prior Agreement**") and wish to amend the Prior Agreement on the term set forth herein.

NOW, THEREFORE, the parties hereby agree that the following will be added to the section labeled "**Transaction Terms**"

| *Distributor Name(s)* | Star Produce US LP |
|---|---|
| | Star Produce LTD |

**1.**    <u>**THE PLATFORM**</u>

Company has developed and maintains an innovative, on-line trading platform (the "*Platform*") that allows Produce Pay to work directly with growers, sellers, and buyers of perishable agricultural commodities ("*Produce*") at shipping point, providing record keeping, marketing, accounting, and other services appurtenant to its Produce dealings. The Platform and the contracts that Produce Pay establishes with its customers and trading partners are carefully designed to facilitate and incentivize trading in Produce in a manner that is more efficient, stable and profitable for participants in the nationwide Produce distribution chain. Company and Distributor expressly acknowledge that Company owns any Produce subject to this Agreement prior to its delivery to Distributor, and Distributor agrees that as such, Company can assert and protect rights as a seller or supplier of Produce under the Perishable Agricultural Commodities Act of 1930 ("PACA"), as amended, 7 U.S.C. §§499a-t. The Platform operates in the following manner (which manner of operation may be changed by Company from time to time in its sole discretion):

(a)    The Distributor shall log into the Platform to notify Company that a Producer has shipped a Distributed Asset Pool owned by Company to the Distributor.

(b)    The Producer will be an approved and registered Producer on the Platform under which the Distributor can accept or reject a Distributed Asset Pool owned by Company.

(c)    The Distributor shall notify Company of its acceptance or rejection of shipment of such Distributed Asset Pool as satisfactory for sale by the Distributor to retailers or wholesalers under the terms of this Agreement. The Distributor will accept the shipment in the Platform and attach shipping documents to the shipment to verify case quantities. All rejected Produce shall not be included in a Distributed Asset Pool and shall be removed from the Platform.

(d)    Upon its acceptance of the Distributed Asset Pool through the Platform, the Distributor will thereby be required to remit to the Company (or to an assignee designated by the Company upon acceptance) the Net Sale Proceeds for such Distributed Asset Pool.

(e)    With respect to each Distributed Asset Pool, upon shipment and invoicing of such Distributed Asset Pool, Distributor shall calculate and notify Company via the Platform of the Gross Sale Proceeds from the retailer or wholesaler for such

Distributed Asset Pool, the Distributors Commission and the Distributor Deductions thereon, and shall attach the invoice for such sale.

(f) Upon request from Producer, the Company in its sole discretion may make an additional purchase price payment to the Producer through the Platform after the Distributor has sold the Produce and entered the information required above into the Platform.

(g) With respect to each Distributed Asset Pool, upon receipt of notification from the Distributor of the shipment and invoicing of such Distributed Asset Pool Company through the Platform, Company shall calculate and notify the Distributor of the Company Proceeds and the Net Sale Proceeds, as well as any Deficit and Excess Deficit.

(h) Distributor will then pay Company the Net Sale Proceeds for such Distributed Asset Pool and the Excess Deficit, if any, for any other Distributed Asset Pool.

(i) The Distributor acknowledges and agrees that Company is a bona fide purchaser acting in good faith with respect to all of its interactions with the Distributor, including, without limitation, all transactions contemplated by this Agreement; the Distributor further acknowledges and agrees that all amounts due and owing to Company in connection with this Agreement, including, without limitation, the Company Expenses, and any other commissions, fees and amounts received by Company in connection with a Distributed Asset Pool are duly earned and obtained for fair and reasonable value from the Distributor.

(j) Under Prepayment Agreements (defined below), Company will from time to time advance to Producers who are parties to such Prepayment Agreements amounts referred to as the Prepaid Asset Pool Purchase Price (as defined in such Prepayment Agreements). The Distributor is guaranteeing hereunder the repayment of all payments due to Company under the Prepayment Agreements and is agreeing to pay to Company hereunder a portion of the Gross Proceeds from any related sales of Produce equal to the Prepayment Recovery Deduction as set forth in the respective Prepayment Agreement (the "**Prepayment Recovery Deduction**") until Company has recovered therefrom the Prepayment Asset Pool Purchase Price (as defined in the applicable Prepayment Agreement), and all other Prepayment Agreement Obligations (defined below), as well as paying any Excess Deficit related thereto (as defined below).

Producer: refers to any party including but not limited to SM Invernaderos S de RL de CV from which the Company acquires Produce that is sold by Distributor under this Agreement.

Guaranty: A new Section 7 is added to the Agreement, which provides in full as follows:

## 7. **SECURED GUARANTY**

7.1 Guaranty. Distributor absolutely, unconditionally and irrevocably guarantees to Company the due and punctual payment, performance and discharge of all liabilities of the Producer to Company under the Prepayment Agreement dated July 17, 2020 between the Company and SM Invernaderos S de RL de CV , up to $1,000,000 USD.

-2-

This guaranty is a guaranty of prompt and punctual payment of the Prepayment Agreement Obligations, and is not merely a guaranty of collection. These obligations are independent of Producer's obligations and separate actions may be brought against Distributor.

7.2 <u>Grant of Security Interest</u>. The Distributor hereby grants to the Company a first priority perfected security interest in all of Distributor's right, title and interest, whether now owned or hereafter acquired, in, to and under Collateral (as defined below) to secure payment of the Prepayment Agreement Obligations.

7.3 <u>Definition of Collateral</u>. "Collateral" means all of Distributor's right, title and interest, in, to and under all personal property and other assets of whatever kind or nature, whether now owned or existing or hereafter arising or acquired, wherever located, including, without limitation, all of Distributor's right, title and interest, in, to and under: (a) all goods and equipment, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located; (b) all inventory, including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Distributor's books relating to any of the foregoing; (c) all contract rights and general intangibles, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind; (d) all accounts, accounts receivable, contract rights, royalties, license rights and all other forms of obligations owing to Distributor arising out of the sale or lease of goods and/or perishable agricultural commodities, the licensing of technology or the rendering of services by Distributor, whether or not earned by performance, and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Distributor and Distributor's books and records relating to any of the foregoing; (e) all documents, cash, deposit accounts, securities, financial assets, securities accounts, securities entitlements, letters of credit, certificates of deposit, instruments and chattel paper and Distributor's books and records relating to the foregoing; and (f) all claims, rights and interests in any of the above and, all substitutions for, additions and accessions to and proceeds thereof.

7.4    <u>Financing Statement</u>. The Distributor authorizes the Company to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Company may determine, or the Company may, at its option, file financing statements or similar records containing any collateral description which reasonably describes the Collateral, and the Distributor will pay the cost of filing them in all public offices where filing is deemed by the Company to be necessary or desirable.

*Signature page follows*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**PRODUCE PAY, INC.**

By: _Ben Dusastre_____

Name: Ben Dusastre
    Title:  CFO

**COMPANY: STAR PRODUCE US LP**

By: _____

Name: _MATT BATES_____
    Title: _SVP_____
    Date: _November 5, 2020_

**COMPANY: STAR PRODUCE LTD**

By: _____

Name: _MATT BATES_____
    Title: _SVP_____
    Date: _November 5, 2020_

# EXHIBIT C

**THIS ADDENDUM** is effective this August 4, 2021

# ADDENDUM 2

The Company (PRODUCE PAY, INC.) and Distributors (STAR PRODUCE US LP and STAR PRODUCE LTD) are parties to a Distribution Agreement dated December 24, 2019 (the "**Prior Agreement**") and wish to amend the Prior Agreement on the term set forth herein.

Guaranty: A new Section 8 is added to the Agreement, which provides in full as follows:

# 8   SECURED GUARANTY

8.1 Guaranty. Distributor absolutely, unconditionally and irrevocably guarantees to Company the due and punctual payment, performance and discharge of all liabilities of the Producer to Company under the Prepayment Agreement dated August 6, 2021, between the Company and Grupo Heres S. de R.L. de C.V., up to $400,000 USD.

This guaranty is a guaranty of prompt and punctual payment of the Prepayment Agreement Obligations, and is not merely a guaranty of collection. These obligations are independent of Producer's obligations and separate actions may be brought against Distributor.

8.2 Grant of Security Interest. The Distributor hereby grants to the Company a first priority perfected security interest in all of Distributor's right, title and interest, whether now owned or hereafter acquired, in, to and under Collateral (as defined below) to secure payment of the Prepayment Agreement Obligations.

8.3 Definition of Collateral. "Collateral" means all of Distributor's right, title and interest, in, to and under all personal property and other assets of whatever kind or nature, whether now owned or existing or hereafter arising or acquired, wherever located, including, without limitation, all of Distributor's right, title and interest, in, to and under: (a) all goods and equipment, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located; (b) all inventory, including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Distributor's books relating to any of the foregoing; (c) all contract rights and general intangibles, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind; (d) all accounts, accounts receivables, contract rights, royalties, license rights and all other forms of obligations owing to

Distributor arising out of the sale or lease of goods and/or perishable agricultural commodities, the licensing of technology or the rendering of services by Distributor, whether or not earned by performance, and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Distributor and Distributor's books and records relating to any of the foregoing; (e) all documents, cash, deposit accounts, securities, financial assets, securities accounts, securities entitlements, letters of credit, certificates of deposit, instruments and chattel paper and Distributor's books and records relating to the foregoing; and (f) all claims, rights and interests in any of the above and, all substitutions for, additions and accessions to and proceeds thereof.

8.4    <u>Financing Statement</u>. The Distributor authorizes the Company to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Company may determine, or the Company may, at its option, file financing statements or similar records containing any collateral description which reasonably describes the Collateral, and the Distributor will pay the cost of filing them in all public offices where filing is deemed by the Company to be necessary or desirable.

*Signature page follows*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**PRODUCE PAY, INC.**

By: _____

Name: Ben Dusastre
Title:  PRESIDNET

**COMPANY: STAR PRODUCE US LP**

By: _____

Name: _____

Title: _____

Matthew Bates
President

**COMPANY: STAR PRODUCE LTD**

By: _____

Name: _____

Title: _____

Matthew Bates
President

# EXHIBIT D

THIS ADDENDUM is effective this August 9, 2021

## ADDENDUM 2

The Company (PRODUCE PAY, INC.) and Distributors (STAR PRODUCE US LP and STAR PRODUCE LTD) are parties to a Distribution Agreement dated December 24, 2019 (the "**Prior Agreement**") and wish to amend the Prior Agreement on the term set forth herein.

Guaranty: A new Section 8 is added to the Agreement, which provides in full as follows:

## 8  SECURED GUARANTY

8.1 Guaranty. Distributor absolutely, unconditionally and irrevocably guarantees to Company the due and punctual payment, performance and discharge of all liabilities of the Producer to Company under the Prepayment Agreement dated August 9, 2021, between the Company and Grupo Heres S. de R.L. de C.V., up to $600,000 USD.

This guaranty is a guaranty of prompt and punctual payment of the Prepayment Agreement Obligations, and is not merely a guaranty of collection. These obligations are independent of Producer's obligations and separate actions may be brought against Distributor.

8.2 Grant of Security Interest. The Distributor hereby grants to the Company a first priority perfected security interest in all of Distributor's right, title and interest, whether now owned or hereafter acquired, in, to and under Collateral (as defined below) to secure payment of the Prepayment Agreement Obligations.

8.3 Definition of Collateral. "Collateral" means all of Distributor's right, title and interest, in, to and under all personal property and other assets of whatever kind or nature, whether now owned or existing or hereafter arising or acquired, wherever located, including, without limitation, all of Distributor's right, title and interest, in, to and under: (a) all goods and equipment, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located; (b) all inventory, including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Distributor's books relating to any of the foregoing; (c) all contract rights and general intangibles, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind; (d) all accounts, accounts receivables, contract rights, royalties, license rights and all other forms of obligations owing to

Distributor arising out of the sale or lease of goods and/or perishable agricultural commodities, the licensing of technology or the rendering of services by Distributor, whether or not earned by performance, and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Distributor and Distributor's books and records relating to any of the foregoing; (e) all documents, cash, deposit accounts, securities, financial assets, securities accounts, securities entitlements, letters of credit, certificates of deposit, instruments and chattel paper and Distributor's books and records relating to the foregoing; and (f) all claims, rights and interests in any of the above and, all substitutions for, additions and accessions to and proceeds thereof.

8.4    <u>Financing Statement</u>. The Distributor authorizes the Company to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Company may determine, or the Company may, at its option, file financing statements or similar records containing any collateral description which reasonably describes the Collateral, and the Distributor will pay the cost of filing them in all public offices where filing is deemed by the Company to be necessary or desirable.

*Signature page follows*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

PRODUCE PAY, INC.

By:

Name: Ben Dusastre
Title: PRESIDENT

COMPANY: STAR PRODUCE US LP

By:

Name: ERNESTO MALDONADO
Title: GENERAL MANAGER

COMPANY: STAR PRODUCE LTD

By:

Name: MATT PATES
Title: VP

# EXHIBIT E

**From:** Matt Bates <Matt@starproduce.com>
**Sent:** Friday, April 29, 2022 5:11:02 PM
**To:** 'ben.kahrl@producepay.com' <ben.kahrl@producepay.com>; 'Pablo Borquez' <pablo@producepay.com>
**Cc:** Ernesto Maldonado <ernesto@starproduce.com>; Dariel Trottier <dariel@cfp-ltd.ca>; Chris Messent <chris@cfp-ltd.ca>
**Subject:** FW: Demand to Pay $600K Guaranty

Ben/Pablo:

Can you please stop harassing members of the Star Group regarding this issue.

I spoke to Ben back in February and indicated that Grupo Heres did not have nor the quality, the quantity, the ability to ship or the varieties indicated at the beginning of the season. Further to this, I just called Ben to indicate the same information.

The deal was grossly misrepresented both by both Produce Pay and Grupo Heres.  Any funds provided to Grupo Heres were done by the free will and vetting of Produce Pay and are not the responsibility of The Star Group.

Matt Bates
The Star Group

---

**From:** Ben Kahrl <ben.kahrl@producepay.com>
**Sent:** Friday, April 29, 2022 4:40 AM
**To:** Matt Bates <Matt@starproduce.com>; Ernesto Maldonado <ernesto@starproduce.com>
**Cc:** Dariel Trottier <dariel@cfp-ltd.ca>; Ana Sofia <ana@producepay.com>; Paula Morellon <paula.morellon@producepay.com>; Cesar Hernandez <cesar.hernandez@producepay.com>
**Subject:** Re: Demand to Pay $600K Guaranty

Matt and Ernesto:

As a follow up to my February 10, 2022 email below, and the efforts to resolve this issue since, I regret to inform you that Produce Pay is still owed $530,128.87 by Grupo Heres.  We do not see any path to collecting this amount from Grupo Heres directly.  Accordingly, Produce Pay is notifying Star Produce US LP and Star Produce Ltd. (the "Star Entities") that

Produce Pay will be enforcing the Guaranty under Addendum 2 against the Star Entities.

The calculation of the amount due is as follows:

Total Collection 04/28: $229,568.79

Total Preseason Wire $600,000.00
Total Fees on Quote $122,917.66
Late Fees 04/28/22  $36,780.00

Payoff Amt 04/28/22    $530,128.87

Please contact this office immediately to make arrangements for payment. We know this is a disappointing result, but we would like to get this matter resolved without attorney's fees and additional late fees being added to your obligation.

Best regards,

**Ben Kahrl**
SVP of Legal and Regulatory Affairs
**M: 202.374.3475**



On Thu, Feb 10, 2022 at 1:43 PM Ben Kahrl <ben.kahrl@producepay.com> wrote:

> Matt and Ernesto:
>
> As you know, Star Produce US LP and Star Produce Ltd. (the "Star Entities") are parties to a 2019 Distribution Agreement (the "Distribution Agreement") with Produce Pay Inc. ("Produce Pay"). The Distribution Agreement was amended with the attached Addendum dated August 9, 2021 ("Addendum 2"). Under Addendum 2, the Star Entities provided a secured guaranty (the "Guaranty") of the full and punctual payment of the obligations of Grupo Heres S. de. R.L. de C.V. ("Grupo") under a Prepayment Agreement between Produce Pay and Heres. The amount of the Guaranty is $600,000.00 USD.
>
> Grupo is now in default of its obligations to Produce Pay under the Prepayment Agreement in a current amount exceeding $603,000.00. Accordingly, Produce Pay is executing its right to enforce the Guaranty against the Star Entities. It appears that the Grupo default has been caused at least partially by the failure of the Star Entities to accept the blackberries that Grupo has offered for sale, including instances of last second cancellations. This behavior violates Produce Pay's expectations and the obligations of the Star Entities under the Distribution Agreement. The Guaranty and the purchase commitments made by the Star Entities were critical factors in Produce Pay's decision to advance funds to Grupo under the Prepayment Agreement.
>
> If Produce Pay does not receive immediate payment of the full $600,000.00 Guaranty from the Star Entities, Produce Pay will enforce its recorded lien against the Star Entities and further recover all costs of collection, including attorney's fees.

We look forward to confirmation of your payment arrangements by the end of this week.

Best regards,

**Ben Kahrl**
SVP of Legal and Regulatory Affairs
M: 202.374.3475



CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

# EXHIBIT F

**STATE OF FLORIDA UNIFORM COMMERCIAL CODE**
**FINANCING STATEMENT FORM**

# FILED

2022 Jun 13 08:06 PM

****** 202201944178 ******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**

Corporation Service Company; 1-800-858-5294

Email  FLSOSUCCFilingsV3@cscglobal.com

**B. SEND ACKNOWLEDGEMENT TO:**

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| STAR PRODUCE US LP |||||
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS Line One | | | | |
| 3380 Wood Edge Circle Suite 102 | | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | Bonita Springs | FL | 34134 | USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS Line One | | | | |
| | | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME**  (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE |||||
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS Line One | | | | |
| P.O. BOX 2576   uccsprep@cscinfo.com | | This space not available. | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
| | SPRINGFIELD | IL | 62708 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

Please see attached Exhibit.

---

**5. ALTERNATE DESIGNATION (if applicable)**  ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR
☐ AG LIEN  ☐ NON-UCC FILING  ☑ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE**  BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**    2339 59701

**STANDARD FORM - FORM UCC-1 (REV.05/2013)**      Filing Office Copy      Approved by the Secretary of State, State of Florida

**Debtor/Assignor: STAR PRODUCE US LP**
**Secured Party: Produce Pay Inc.**

## EXHIBIT A

## DESCRIPTION OF COLLATERAL

Collateral means all right, title and interest of STAR PRODUCE US LP ("Debtor"), in, to and under all personal property and other assets of whatever kind or nature, whether now owned or existing or hereafter arising or acquired, wherever located, including, without limitation, all of Debtor's right, title and interest, in, to and under: (a) all goods and equipment, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located; (b) all inventory, including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Debtor's books relating to any of the foregoing; (c) all contract rights and general intangibles, including, without limitation, goodwill, trademarks, servicemarks, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer lists, route lists, infringements, claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind; (d) all accounts, contract rights, royalties, license rights and all other forms of obligations owing to Debtor arising out of the sale or lease of goods, the licensing of technology or the rendering of services by Debtor, whether or not earned by performance, and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Debtor and Debtor's books and records relating to any of the foregoing; (e) all documents, cash, deposit accounts, securities, financial assets, securities accounts, securities entitlements, letters of credit, certificates of deposit, instruments and chattel paper and Debtor's books and records relating to the foregoing; and (f) all claims, rights and interests in any of the above and, all substitutions for, additions and accessions to and proceeds thereof.